FILED

FEB 1 4 2018

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
v.                              )
                                )        **4:18CR000139 RWS/JMB**
                                )
WILLIAM DOUGLAS HANING,         )
                                )
        Defendant.             )

## INDICTMENT

The Grand Jury charges that:

### Count 1
### (Conspiracy:  18 U.S.C. § 1349)

1.      Beginning sometime prior to July of 2007, the exact date being unknown to the

Grand Jury, and continuing through October of 2014, in the Eastern District of Missouri, and

elsewhere, the defendant,

### WILLIAM DOUGLAS HANING,

did knowingly and willfully combine, conspire, confederate and agree with others both known

and unknown to the Grand Jury, to commit various offenses defined in Title 18, United States

Code, Part 1, Chapter 63, that is:

        a.      having knowingly devised and intending to devise a scheme to defraud,

and to obtain money and property by means of false and fraudulent pretenses, representations

and promises, and for the purpose of executing and attempting to execute that scheme, did mail,

cause to be mailed, cause to be delivered by mail, and deposit and cause to be deposited matters

and things to be sent and delivered by private and commercial interstate carriers, in violation of

Title 18, United States Code, Section 1341; and

      b.     having knowingly devised and intending to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing that scheme, transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

      2.     The allegations of Paragraphs 1 through 82 of Counts 2-31 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein, all in violation of Title 18, United States Code, Section 1349 (Title 18, United States Code, Sections 1341 and 1343).

### COUNTS 2 - 31
### (Wire Fraud:  18 U.S.C. § 1343)

The Grand Jury further charges:

## I.    INTRODUCTION AND OVERVIEW OF THE ADULTERATION SCHEME

At all times material to this Indictment:

      1.     "Adulterated" pet food ingredients and products refer to food in which any valuable constituent has been in whole or in part omitted; food in which any substance has been substituted wholly or in part therefor; and food to which any substance has been added or mixed so as to make it appear the food is better or of greater value than it is.

### A.    Pet food ingredients and products generally

      2.     Food ingredients and products used in pet foods include chicken meal, chicken meal (low ash), turkey meal, chicken by-product meal, and turkey by-product meal.

      3.     As understood in the feed and pet food industry,

      a.     chicken meal, chicken meal (low ash), and turkey meal are dry rendered poultry products that do not contain feathers, heads, feet, and entrails;

      b.     chicken by-product meal and turkey by-product meal are dry rendered

2

poultry products that do not contain feathers.  Chicken by-product meal and turkey by-product meal, however, include parts such as necks, feet, undeveloped eggs, and intestines;

        c.     blending is the process of mingling or combining two or more ingredients;

        d.     adding or blending feather meal or by-product meal or both to chicken meal results in the product no longer being chicken meal;

        e.     adding or blending feather meal or by-product meal or both to chicken meal (low ash) results in the product no longer being chicken meal (low ash);

        f.     adding or blending feather meal or by-product meal or both to turkey meal results in the product no longer being turkey meal;

        g.     adding or blending feather meal to chicken by-product meal results in the product no longer being chicken by-product meal;

        h.     adding or blending feather meal to turkey by-product meal results in the product no longer being turkey by-product meal;

        i.     a blended product consisting of feather meal and chicken by-product meal is not chicken meal;

        j.     a blended product consisting of feather meal and chicken by-product meal is not chicken meal (low ash);

        k.     a blended product consisting of feather meal and chicken by-product meal (and/or turkey by-product meal) is not turkey meal;

        l.     a blended product consisting of feather meal and chicken by-product meal is not chicken by-product meal.

        4.     As to the products and ingredients referenced in paragraphs 3.a through

3.l, the pet food and feed industry generally made exceptions for trace amounts of expressly excluded parts, which occur unavoidably in good manufacturing practices.

5.      At all relevant times, the pet food industry considered chicken meal, low ash chicken meal and turkey meal to be premium products and were typically more expensive to purchase than by-product meals.

6.      The pet food manufacturers used and relied upon Bills of Lading ("BOLs") and Certificates of Analysis ("COAs") to identify ingredients and products shipped and received from suppliers.

**B.      Entities**

7.      American By-Products ("ABP") was a Texas corporation located in Rosser, Texas and Dallas, Texas.  ABP was a protein blender for the pet food industry that emphasized marketing chicken meal and chicken by-product meal.  ABP's blending facility in Rosser, Texas ("ABP-Rosser") was not a rendering facility.  Instead, ABP-Rosser purchased its raw poultry materials from rendering facilities and based its business model on its ability to grind, screen, classify, blend, and stabilize animal proteins that needed to be processed.  ABP owners and shareholders included Defendant William Douglas "Doug" Haning and other Haning family members.

8.      Diversified Ingredients, Inc. ("Diversified Ingredients") is a Missouri corporation located in Ballwin, Missouri, within the Eastern District of Missouri.  Diversified Ingredients is a commodities broker and distributor whose customers include a number of pet food companies and manufacturers.  From 2008 through 2014 and thereafter, Diversified Ingredients brokered and distributed pet food products and ingredients from the facility in Rosser, Texas.

9.      Wilbur-Ellis Company ("Wilbur-Elllis") is a California LLC with headquarters in

4

San Francisco, California. Wilbur-Ellis is an international marketer and distributor of

agricultural products, animal feed, and specialty chemicals and ingredients. On or about April

2011, Wilbur-Ellis purchased the assets of ABP, specifically the blending facility in Rosser,

Texas. At the time of the acquisition, Wilbur-Ellis identified the role of ABP owner DOUG

HANING in the operations of ABP-Rosser as follows:

> **Doug Haning** *is the day to day man on the street. He is in charge of buying and selling. He also manages the logistics of the business. Doug is responsible for all of the marketing of products and maintains the relationships with the customer and supplier base for the business.*

10.    Custom AG Commodities, LLC ("Custom AG") is a Texas company (and sole-

proprietorship) established on or about April 2011, with a physical address in Winnsboro, Texas

and a mailing address in Sulphur Springs, Texas. Custom AG served primarily to facilitate

transactions involving Wilbur-Ellis' newly acquired facility in Rosser, Texas ("WE-Rosser") and

Diversified Ingredients.

11.    Pet Food Manufacturer "A" is a pet food manufacturer with a facility in

Mishawaka, Indiana. Between 2012 and May 2014, Pet Food Manufacturer "A" received

multiple adulterated shipments from Rosser, Texas, including adulterated shipments falsely

identified, labeled and branded as chicken meal, chicken meal (low ash), and turkey meal.

12.    Pet Food Manufacturers "B-1" through "B-6" are pet food manufacturers

identified as "co-packers" and "co-manufacturers." Pet Food Manufacturers "B-1" through "B-

6" contracted with Pet Food Manufacturer "B," a pet food company located in Wilton,

Connecticut, to manufacture and bag finished pet food products for Pet Food Manufacturer "B."

These co-manufacturers and co-packers included:

a.    Pet Food Manufacturer "B-1" and its facility in Fairview, Kansas;

b.    Pet Food Manufacturer "B-2" and its facility in Bern, Kansas;

5

        c.       Pet Food Manufacturer "B-3" and its facility in Frontenac, Kansas;

        d.       Pet Food Manufacturer "B-4" and its facility in Hazel Township,

Pennsylvania;

        e.       Pet Food Manufacturer "B-5" and its facilities in Owatonna, Minnesota

and St. Marys, Ohio; and

        f.       Pet Food Manufacturer "B-6" and its facility in Perham, Minnesota.

13.     Between 2012 and May of 2014, Pet Food Manufacturer "B-1" through "B-6" received multiple adulterated shipments from Rosser, Texas, including adulterated shipments falsely identified, labeled and branded as chicken meal, chicken meal (low ash), and turkey meal.

14.     From 2008 through October 2014, in the Eastern District of Missouri, and elsewhere, the defendant,

**WILLIAM DOUGLAS HANING,**

and other persons known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme to defraud, carried out the scheme and the conspiracy in the manner and means as follows:

**II.**    **MANNER AND MEANS OF THE SCHEME AND THE CONSPIRACY**

15.     From at least 2008 and continuing through May of 2014, the facility in Rosser, Texas, shipped poultry protein products to pet food manufacturers in the United States and abroad.  As part of a conspiracy and scheme and artifice to defraud, the facility in Rosser, Texas, operating under the direction of WILLIAM DOUGLAS HANING (referred to herein as "DOUG HANING"), and others, for the purpose of financial gain, regularly produced and shipped

6

adulterated poultry products and ingredients and misrepresented the products and ingredients. While corporate ownership of the Rosser, Texas facility changed over the course of the scheme and conspiracy, DOUG HANING, at all relevant times, directed and participated in the scheme and conspiracy with others. As part of the scheme and conspiracy and in furtherance of the scheme and conspiracy, DOUG HANING, and others, shipped adulterated pet food ingredients and products through the Eastern District of Missouri and elsewhere. As part of the scheme and conspiracy and in furtherance of the scheme and conspiracy, DOUG HANING, and others, shipped adulterated pet food ingredients and products through the Eastern District of Missouri that included BOLs and COAs that misrepresented the products and ingredients. As part of the scheme and conspiracy, and in furtherance of the scheme and conspiracy, DOUG HANING, and others, negotiated and authorized the purchase of raw materials, such as feather meal, utilized in adulterated pet food ingredients and products. As part of the scheme and conspiracy, and in furtherance of the scheme and conspiracy, DOUG HANING, and others, utilized brokers and distributors in the Eastern District of Missouri and elsewhere to ship and distribute adulterated and misrepresented pet food ingredients and products.

**A. The role of adulteration and mislabeling/misbranding in the scheme to defraud and conspiracy**

16.     From before January 2008 through May of 2014, DOUG HANING, and others, by and through ABP, Wilbur-Ellis, Diversified Ingredients and/or Custom AG, marketed and sold chicken meal and low ash chicken meal from Rosser, Texas. However, the product shipped from ABP-Rosser and WE-Rosser was an adulterated product that was mislabeled and misbranded.

17.     From May of 2011 through May of 2014, DOUG HANING, and others, by and through Wilbur-Ellis, Diversified Ingredients and/or Custom AG, marketed and sold turkey meal

7

from Rosser, Texas. However, the product shipped from WE-Rosser was an adulterated product that was mislabeled and misbranded.

18. From before January 2008 through May of 2014, DOUG HANING, and others, by and through ABP, Wilbur-Ellis, Diversified Ingredients and/or Custom AG, marketed and sold chicken by-product meal from Rosser, Texas. However, the product shipped from ABP-Rosser and WE-Rosser was an adulterated product that was mislabeled and misbranded.

19. As part of the scheme to defraud and in furtherance of said scheme and the conspiracy, DOUG HANING, and others, adulterated and misrepresented ingredients and products, and in doing so:

     a. omitted and caused to be omitted, in whole or in part, the raw material ingredient chicken meal from premium pet food products and ingredients, specifically chicken meal and chicken meal (low ash), that was shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser;

     b. omitted and caused to be omitted, in whole or in part, the raw material ingredient turkey meal from premium pet food products and ingredients, specifically turkey meal, that was shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser;

     c. substituted and caused to be substituted, in whole or in part, chicken by-product meal for premium pet food products and ingredients, such as chicken meal, chicken meal (low ash), and turkey meal, that was shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser;

     d. substituted and caused to be substituted, in whole or in part, a "B-Grade" poultry by-product meal (also referred to as chicken bone by-product meal) for premium pet food

8

products and ingredients, such as chicken meal and turkey meal, that was shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser;

    e.  substituted and caused to be substituted, in whole or in part, turkey by-product meal for premium pet food products and ingredients, such as turkey meal, that was shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser;

    f.  substituted and caused to be substituted, in whole or in part, hydrolyzed poultry feathers (also referred to as feather meal) or hydrolyzed feather meal for premium pet food products and ingredients, such as chicken meal, chicken meal (low ash), and turkey meal, that was shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser;

    g.  mixed and blended and caused to be mixed and blended, chicken by-product meal with one or more raw materials to make the products and ingredients shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser appear better and of greater value than the product actually was;

    h.  mixed and blended and caused to be mixed and blended, turkey by-product meal with one or more raw materials to make the products and ingredients shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser appear better and of greater value than the product actually was;

    i.  mixed and blended and caused to be mixed and blended, a "B-Grade" poultry by-product meal (also referred to as chicken bone by-product meal) with one or more raw materials to make the products and ingredients shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser appear better and of greater value than the product actually was; and

j.      mixed and blended and caused to be mixed and blended, hydrolyzed poultry feathers and feather meal with one or more raw materials to make the products and ingredients shipped and supplied to pet food companies and manufacturers from ABP-Rosser or WE-Rosser appear better and of greater value than the product actually was.

**B.      Administrative and Regulatory Investigations of ABP-Rosser by the State of Texas**

20.      At all relevant times, the Texas Feed and Fertilizer Control Service ("TFFCS") operates under the direction of the Director of the Texas Agricultural Experiment Station ("TX Ag Station"). The TX Ag Station is an entity responsible for exercising the powers and performing the duties assigned to the TFFCS by the Texas Commercial Feed Control Act, Texas Agriculture Code (1981), Chapter 141. The Office of the Texas State Chemist ("OTSC") is also part of the TFFCS. As a licensed feed facility, ABP-Rosser was regulated by the TFFCS and the OTSC. Applicable regulations included prohibitions specific to the adulteration and mislabeling of ingredients used in pet foods.

**2007**

21.      On or about July 2007, TFFCS investigators inspected the ABP-Rosser facility. TFFCS investigators held discussions with the ABP-Rosser Quality Assurance Manager concerning the receipt and use of hydrolyzed feather meal in the facility. Specifically, a TFFCS Investigator, who had routinely checked incoming and outgoing ABP-Rosser records, noticed that the facility consistently received feather meal, but had never distributed products containing feather meal.

22.      The Quality Assurance Manager, who at all relevant times reported to ABP ownership, including DOUG HANING, indicated to TFFCS investigators that ABP-Rosser used feather meal as "a proprietary secret." At that time, the Quality Assurance Manager represented

10

that the feather meal lowered the ash level of the chicken meal, thus providing a higher value ingredient, low ash chicken meal, for use in the pet food industry.

23.     TFFCS Investigators advised the Quality Assurance Manager and one of the ABP owners that that practice was unacceptable.

24.     The TFFCS informed the Quality Assurance Manager and the ABP owner that the mixing of two ingredients creates a blended product that cannot be labeled as an individual ingredient.  The TFFCS Investigator consulted with the Quality Assurance Manager and assisted ABP-Rosser in creating an appropriate blended product label for the product actually being shipped.

25.     The designated name for the blended product was "ABP Poultry Blend" and the ingredients required to appear on the label were "poultry by-product meal" and "hydrolyzed poultry feathers."

## 2008

26.     A TFFCS Investigator visited the ABP-Rosser facility again in October 2008.

27.     The TFFCS Investigator held discussions with the same ABP owner concerning the continued practice of blending feather meal into other ingredients (without identifying the product as a blend or identifying feather meal as an ingredient).  The ABP owner stated that the practice was no longer occurring.  The TFFCS Investigator, however, noted that there were no records of "ABP Poultry Blend" being marketed after the label was created.  The TFFCS Investigator reiterated to ownership that mixing feather meal into other ingredients was not an acceptable practice, unless distributed as a blended product and appropriately labeled as a blend with the actual ingredient identified on the blend label.

28.     A TFFCS audit conducted on or about November 4, 2008 confirmed the

11

continued use of feather meal by ABP-Rosser in its products and ingredients.

## 2010

29.     On or about May 12, 2010, OTSC auditors and investigators met with DOUG

HANING and other owners and managers of ABP-Rosser.  The OTSC investigators and auditors

wanted to discuss an OTSC microscopic evaluation of ABP-Rosser's product(s) as well as an

OTSC audit report.  Both the evaluation and the audit confirmed the continued use of feather

meal in ABP-Rosser products and the regular distribution of adulterated, misbranded pet food

products and ingredients.  An ABP-Rosser sales manager "alluded to the fact" that customers

requested ABP-Rosser put feather meal into their product, but wanted it labeled as a single

ingredient product such as "chicken meal."  In response, the OTSC told the owners and

managers of ABP-Rosser that they should not be involved in deceptive practices.

30.     DOUG HANING and another manager then provided OTSC investigators access

to the ABP-Rosser plant for inspection.  After inspecting the plant, the investigators concluded

that ABP-Rosser's routine practice was "that everything that left the facility had feather meal in

it" and that ABP-Rosser products were adulterated and misbranded.

31.     After seeing the blending equipment and the amount of feather meal at the ABP-

Rosser facility, the OTSC investigator "was compelled to stop-sale/seize the low-ash chicken

meal based on reasonable cause by the agency and the supporting evidence from previous

microscopic evaluation of the product."

32.     On or about May 12, 2010, the OTSC ultimately seized 33,720 lbs. (in 18 bulk

bags) of low-ash chicken meal.  The OTSC also collected samples of other ingredients for

additional evaluation.  The cited grounds for the seizure was "FAILURE TO PROVIDE NON-

ADULTERATED PRODUCT; IMPROPERLY LABELED (MISBRANDED)."

33.     On May 17, 2010, ABP-Rosser provided a letter to the Office of the Texas State

Chemist that stated the following:

> *We wanted to submit the following plan to your office regarding use of feather*
> *meal. We feel that the safest and surest way to eliminate any hydrolyzed feather*
> *meal being in any product being sold from this plant is to discontinue purchasing*
> *hydrolyzed feather meal.*
> *AMERICAN BY-PRODUCTS, INC.*
> *William Haning*

34.     On June 2, 2010, the OTSC issued its "Report of Analysis for Commercial Feed"

regarding the sample of ABP-Rosser's LOW ASH CHICKEN MEAL. The OTSC report also

included the results of a microscopic examination. The report stated: *"hydrolyzed and*

*unhydrolyzed feathers found in sample (too many to count)."* On the basis of the report, ABP-

Rosser was informed that its "product is considered to be in violation of one or more provisions

of the Texas Commercial Fertilizer Control Act, Chapter 63.142(a)."

35.     Notwithstanding the above violation and ABP's representation that it would

discontinue purchasing feather meal, shipping and purchasing records reflect that the Rosser,

Texas facility continued to receive regular shipments of feather meal after May of 2010.

**C.      Wilbur-Ellis' acquisition of ABP-Rosser**

36.     On or about March 4, 2011, ABP and Wilbur-Ellis executed a "Letter of Intent"

regarding the acquisition of ABP-Rosser by Wilbur-Ellis.

37.     Prior to executing the Letter of Intent, Wilbur-Ellis had identified ABP-Rosser's

customer base as follows:

> *Customers. On the sales side of the business, ABP sells 13 different companies*
> *(all pet food), six of which constitute about 75% of their sales.*

38.     Prior to executing the Letter of Intent, Wilbur-Ellis had identified the possible

integration of ABP-Rosser as follows:

13

*Integration and Management Plan.  The Wilbur-Ellis Company logo and branding would be promptly initiated however the reporting structure at Rosser, TX will remain unchanged for the most part.  The Hanings would continue their current roles in a post acquisition scenario.*

## The terms of the acquisition as reflected in the Letter of Intent

39.     The March 4, 2011 Letter of Intent included the following provisions and terms:

   a.     *Buyer would acquire all assets of the Seller relating to the production, blending, distribution, and sale of proteins, fats and oils to the pet food, aquaculture and livestock industries (the "Business");*

   b.     *The purchase price of the Assets, including working capital, would be (i) Sixteen Million Dollars ($16,000,000), adjusted to reflect the difference between the Business' average Net Working Capital over the past year, and the Business' Net Working Capital at the date of closing; plus (ii) up to Nine Million Dollars ($9,000,000) in one or more Deferred Payments as described below;*

   c.     *$9,000,000 of the purchase price would be paid over the three years following closing, based on achievement of certain operating performance goals for the business following closing;*

   d.     *Employment and Noncompetition Agreements.  As a condition to Buyer's obligation to purchase the Assets and in consideration of the payment of the Purchase Price to Seller, (i) Seller and its shareholders shall enter into Noncompetition Agreements with Buyer wherein they would agree not to compete in the pet food, aquaculture or livestock industries, or to solicit customers or employees of the Business, for a period of five (5) years following the closing, except for the following Employment Agreements.*

## DOUG HANING's employment agreement with Wilbur-Ellis

40.     As part of the acquisition, DOUG HANING entered into an employment

14

agreement with Wilbur-Ellis.

    41.     The provisions of the EMPLOYMENT AGREEMENT included the following:

    a.     *THIS AGREEMENT is made as of April 30, 2011 (the "Effective Date") by and between Wilbur-Ellis Company, a California corporation (the "Employer"), and William D. (Doug) Haning (the "Employee").*

    b.     *The Employee is one of the shareholders of ABP and is experienced in the Business.*

    c.     *Agreement for Employment. Subject to the closing of the transactions contemplated by the APA and this Agreement's terms and conditions, the Employer engages the Employee, and the Employee accepts employment as Operations Manager of the Employer's Rosser, Texas branch.*

    42.     The asset purchase proceeded under the terms set forth above and included both the deferred payment incentive and an employment agreement as to DOUG HANING.

    43.     Thus, in addition to a salary and any applicable bonus, DOUG HANING and his family would be entitled to one or more deferred payments in an amount up to $9,000,000 if WE-Rosser's profitability remained consistent with the profitability of ABP-Rosser and met the yearly earn-out targets projected by Wilbur-Ellis.

**D.    The scheme to defraud and conspiracy as carried out after the acquisition of ABP by Wilbur-Ellis**

    44.     DOUG HANING, and others, by and through Wilbur-Ellis, Custom AG and/or Diversified Ingredients, marketed and sold single-ingredient premium pet food ingredients and products, including chicken meal, chicken meal (low ash), and turkey meal, knowing the product shipped would be, and in fact was, adulterated and misrepresented to the recipient.

    45.     As part of the conspiracy and scheme to defraud, DOUG HANING, and others,

used one or more third parties who accepted contracts, purchase orders, invoices and other written communications from WE-Rosser identifying WE-Rosser products as blends, but provided WE-Rosser shipping documents, such as BOLs and COAs, that did not identify the WE-Rosser products as blends. In turn, as part of the scheme to defraud and the conspiracy, DOUG HANING, and others, would use single-ingredient BOLs and COAs with shipments known to be blends.

46. The products and ingredients DOUG HANING, and others, shipped and caused to be shipped from WE-Rosser were blended and adulterated by:

a. Adding, using and/or blending feathers and feather meal to the shipped product and ingredient when it was to be exclusive of feathers;

b. Adding, using and/or blending by-product meal to the shipped product and ingredient when it was to be exclusive of by-product;

c. Adding, using and and/or blending chicken protein products to the shipped product and ingredient when it was to be a turkey protein product.

47. The products and ingredients DOUG HANING, and others, shipped and caused to be shipped from the facility in Rosser, Texas, were mislabeled and misbranded and thus, such products and ingredients were misrepresented to the recipient. Documents associated with the shipment, such as a BOL or COA, identified the shipped product as a single ingredient product when, in fact, it was a blend. Typically, the blend formula for products shipped as chicken meal and chicken meal (low ash) was a blend of chicken by-product meal and feather meal (but not chicken meal). Typically, the blend formula for products shipped as turkey meal was a blend that included by-product meals and feather meal. Based on the cost of goods sold, blend formulas utilized in furtherance of the fraud and conspiracy ensured that a profit margin would

16

be realized because the blended product was sold at the premium market price as if it were a single ingredient product.

48.     The raw ingredients purchased by WE-Rosser and used in the blended product were generally cheaper than the single-ingredient, premium products identified on shipping documents.

49.     Generally, the raw ingredients used in the blended product were readily available to WE-Rosser from its suppliers in comparison to single-ingredient, premium products such as chicken meal and turkey meal.  Thus, WE-Rosser realized a significant profit on adulterated shipments.  Because WE-Rosser blended cheaper and more readily available raw ingredients, WE-Rosser also had the ability to enter into high volume, long-term agreements and contracts confident they would have a predictable supply of raw materials.  Moreover, the concealment of its blending practices afforded WE-Rosser the ability to manipulate blend formulas based upon market circumstances and profit objectives.

50.     In addition, over the course of the scheme and conspiracy, certain pet food manufacturers, including Pet Food Manufacturer "A" and Pet Food Manufacturer "B," had emerged in the pet food market and built their business model by marketing their products as free of certain ingredients.

51.     DOUG HANING, and others, knew that certain pet food manufacturers were not in the market for products or ingredients typically used in the blended products shipped from WE-Rosser, such as feather meal and poultry by-products.

52.     By avoiding the identification of the product as a blend in the associated shipping documents, including BOLs and COAs, DOUG HANING, and others, were able to conceal the actual ingredients contained in the products shipped, such as feather meal and by-products, and

17

secure, maintain, and grow business that would otherwise have been unavailable.

53.     Because shipped WE-Rosser products were not identified as a blend and because the actual ingredients were concealed, the recipients of WE-Rosser products (including Pet Food Manufacturer "A" and Pet Food Manufacturers "B-1" through "B-6") accepted shipments they would not have otherwise accepted but for the fraud.

54.     Ultimately, pet food manufacturers, including Pet Food Manufacturer "A" and Pet Food Manufacturer "B," ended up paying the market price for a premium, single-ingredient product, such as chicken meal, chicken meal (low ash), or turkey meal, when they actually received a blended product comprised of non-premium ingredients.

**E.     The introduction of Custom AG as a straw broker in furtherance of the conspiracy and scheme to defraud**

55.     Prior to April 2011, Custom AG was not in existence as an entity recognized by the State of Texas.  Prior to April 2011, neither Custom AG nor Custom AG's nominal owner, had contracted with ABP or Diversified Ingredients.  Prior to April 2011, neither Custom AG nor Custom AG's nominal owner, had brokered or otherwise bought or sold animal protein products for pet food companies.

56.     Custom AG was not identified as a customer of ABP until May 1, 2011, when it was added to the original customer list.

57.     As of April 30, 2011, Custom AG was not in Diversified Ingredients' system as a seller.

58.     On or about July 2011, Custom AG identified only two trade references in support of obtaining a line of credit with Wilbur-Ellis.  The identified trade references were ABP and Diversified Ingredients.

59.     At all times material, the nominal owner of Custom AG was an associate of

DOUG HANING, and DOUG HANING shared in the profits of Custom AG. At all times material, DOUG HANING, in whole or part, directed the buying and selling decisions, as well as the operations of Custom AG. DOUG HANING purposely concealed his interest in Custom AG from others.

60.     In furtherance of the scheme to defraud and the conspiracy, and as a result of the execution of the scheme to defraud, in 2012, 2013, and the first two quarters of 2014, Custom AG constituted the single largest purchaser of WE-Rosser products by sales and volume. Any products Custom AG bought from WE-Rosser during this time frame were sold to Diversified Ingredients. Pet Food Manufacturer "B-1" through "B-6" received adulterated shipments arising from initial purchases involving Custom AG and Diversified Ingredients. Pet Food Manufacturer "A" received adulterated shipments arising from initial purchases involving Custom AG and Diversified Ingredients.

61.     Most, if not all, products from WE-Rosser involving Custom AG were blended and adulterated when shipped. Most, if not all, products from WE-Rosser involving Custom AG were shipped from WE-Rosser with BOLs and/or COAs that misrepresented the product as a single ingredient, premium product.

**F.     The use of Diversified Ingredients' BOLs and COAs in furtherance of the scheme to defraud and conspiracy**

62.     Pet Food Manufacturer "B" was a Diversified Ingredients' customer. On behalf of Pet Food Manufacturer "B," Diversified Ingredients contracted with carriers to ship products and ingredients from WE-Rosser to Pet Food Manufacturers "B-1" through "B-6."

63.     Pet Food Manufacturer "A" was also a Diversified Ingredients' customer. On behalf of Pet Food Manufacturer "A," Diversified Ingredients contracted with carriers to ship certain products and ingredients from WE-Rosser to Pet Food Manufacturer "A."

64.     Diversified Ingredients, however, did not directly purchase from Wilbur-Ellis the products and ingredients shipped from WE-Rosser to Pet Food Manufacturers "B-1" through "B-6." Diversified Ingredients also did not directly purchase from Wilbur-Ellis certain products and ingredients shipped to Pet Food Manufacturer "B-1" through "B-6."

65.     Instead, such products and ingredients involved initial paper transactions and sales with Custom AG. In the paperwork with Custom AG, Wilbur-Ellis referred to certain products purchased by Custom AG from WE-Rosser as a blend. The purchase orders and invoices between Custom AG and Diversified Ingredients also referred to certain WE-Rosser products as a "blend," such as "chicken meal blend," "chicken meal blend low ash" and "turkey meal blend."

66.     While certain exchanged paperwork identified products as a blend, Diversified Ingredients provided BOLs and COAs to WE-Rosser that did not identify the product as a blend. Instead, the shipping documents that traveled with the product, including BOLs and COAs, used the single-ingredient names, *i.e.*, chicken meal, chicken meal low ash, and turkey meal.

67.     While WE-Rosser created and maintained their own internal documents that identified the shipped products as blended products, DOUG HANING, and others, used shipping documents provided by Diversified Ingredients knowing that the use of those documents would misrepresent what was actually being shipped from WE-Rosser.

68.     DOUG HANING, and others, agreed to use, and did, in fact, use the BOLs and COAs provided by Diversified Ingredients with shipments of blended products knowing that WE-Rosser was shipping a blended product and that the ingredients involved in the blend, specifically by-products and feather meal, were to be excluded from the product identified and shipped.

20

G.   **Direct sales of adulterated and mislabeled products and ingredients from WE-Rosser**

69.     WILBUR-ELLIS sold products and ingredients for use in pet food products. Those sales included direct sales by WILBUR-ELLIS to pet food companies and manufacturers.

70.     In addition to the sales and shipments identified above involving Custom AG and/or Diversified Ingredients, WILBUR-ELLIS directly marketed and sold products and ingredients to pet food manufacturers, including Pet Food Manufacturer "A," that were shipped from WE-Rosser.

71.     As part of the scheme and in furtherance of the scheme and conspiracy, DOUG HANING, and others, caused WE-Rosser to ship adulterated and mislabeled products and ingredients, including chicken meal (low ash), that Pet Food Manufacturer "A" purchased directly from WILBUR-ELLIS.

III.   **USE OF THE MAIL AND COMMERCIAL INTERSTATE CARRIERS IN FURTHERANCE OF THE SCHEME TO DEFRAUD AND THE CONSPIRACY**

72.     On or about the dates listed below, within the Eastern District of Missouri, and elsewhere, for the purpose of executing and attempting to execute the scheme to defraud, and in furtherance of the conspiracy DOUG HANING, and others known and unknown to the Grand Jury, did mail, caused to be mailed, and caused to be delivered by mail matters and things, to wit, checks and payments, and did deposit and caused to be deposited matters and things, to wit, checks, BOLs, COAs, and products to be sent and delivered by private and commercial interstate carrier:

| Date | Check no. | Destination |
|------|-----------|-------------|
| February 8, 2013 | 0099873 | Los Angeles, CA |
| October 3, 2013 | 0108688 | Sulphur Springs, TX |
| February 20, 2014 | 0113938 | Sulphur Springs, TX |
| March 26, 2014 | 0115207 | Los Angeles, CA |

| Date | BOL no. for adulterated shipment | Destination |
|------|----------------------------------|-------------|
| March 21, 2014 | 39277 | Mishawaka, IN |
| April 4, 2014 | 39372 | Mishawaka, IN |
| April 29, 2014 | 39586 | Mishawaka, IN |

## IV.   USE OF INTERSTATE WIRES IN FURTHERANCE OF THE SCHEME TO DEFRAUD AND THE CONSPIRACY

73.      In furtherance of the scheme and the conspiracy, and for the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so, DOUG HANING, and others, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice, as set forth below:

a.      Emails to and from the Eastern District of Missouri and elsewhere and to and from Rosser, Texas, including emails that included and/or pertained to:

i.      contracts, purchase orders and agreements for WE-Rosser products;

ii.      BOLs and COAs for shipments of WE-Rosser products;

iii.      shipping schedules for WE-Rosser products; and

iv.      invoices for products shipped from WE-Rosser.

b.      Additional emails sent as part of the scheme and in furtherance of the scheme included:

i.      on or about February 2009, an email was sent from the Eastern District of Missouri to a Georgia-based customer of Diversified Ingredients and recipient of a poultry product from ABP-Rosser. The email included an attachment identified as "Diversified Statement" consisting of a letter from ABP-Rosser provided to Diversified Ingredients by DOUG HANING. The email states, in part: *This is a letter that [a Diversified Ingredient employee]*

22

*requested from American Byproducts in an effort to get something from them that indicates that they did not adulterate the product or put any feathers into it.*

      ii.      On or about June 19, 2012, an email was sent from a Wilbur-Ellis inventory specialist that describes the raw material formula used at WE-Rosser.  The email was subsequently forwarded to WE-Rosser in Texas.  The email states:  *For Regular loads our blend is 25% Feather Meal, 25% PBM (Hole 1) and 50% PBM (Bin 2); and for Low Ash loads the blend is 25% Feather Meal and 75% (Bin 2).*

      iii.      On or about October 16, 2012, an email was sent from a Wilbur-Ellis employee to another Wilbur-Ellis employee.  The email states:  *Doug asked me to provide you with the following information:  On the turkey meal contract with DI, our margin for bulk loads is around 20%.  On the low ash chicken meal contract, our margin has been 18.09% for a low and 45.14% for a high.  The usual margin is around 30%.*

      iv.      On or about October 18, 2012, an email was sent from a Wilbur-Ellis inventory specialist to DOUG HANING, and others.  The email states:

> *Doug, we are trying to use the cost associated with the physical products that are used.  That being said, we have run out of B grade product and are forced to use more A grade and less Feather meal in order to make regular chicken meal loads.  This has caused the cost to jump significantly and thus has affected the margins accordingly.*
>
> *Previously, we were using a blend for Regular loads of:*
> *Feather - 29%*
> *A grade - 42%*
> *B grade - 29%*
>
> *Since we have run out of B Grade the blend had to be changed to:*
>
> *Feather - 14%*
> *A grade - 86%*
>
> *Thus the increase in cost and decrease in Margin.*

23

v.      On or about February 20, 2013, emails were exchanged to and from Rosser, Texas, and Ballwin, Missouri, regarding products referred to by the WE-Rosser Quality Assurance Manager as "Turkey Meal Blend," "Chicken Meal Blend," and "Low Ash Chicken Meal Blend" and the agreed to use of a COA form that did not identify the product as a "blend" and would match the BOL being used for shipments.

vi.      On or about March 14, 2014, an email communication from a Wilbur-Ellis employee in the State of Washington to DOUG HANING in Texas which stated: *Doug, I noticed we are shipping a blend of PBM and Feather to [Pet food Manufacturer "A"] against a chicken meal contract?*

74.      Adulterated and misrepresented shipments occurred on a weekly, if not daily, basis from WE-Rosser. Those adulterated and misrepresented shipments included the following:

a.      On or about January 2, 2014, a shipment, with an approximate weight of 48,340 pounds, from Rosser, Texas, of an animal protein product and ingredient for pet food which was falsely labeled as "Chicken Meal," when in fact the product and ingredient was not the premium pet food product and ingredient chicken meal but an adulterated mix and blend of hydrolyzed poultry feathers, poultry by-product meal and chicken by-product meal that omitted chicken meal;

b.      On or about March 21, 2014, a shipment, with an approximate weight of 50,200 pounds, from Rosser, Texas, of an animal protein product and ingredient for pet food which was falsely labeled as "Turkey Meal," when in fact the product and ingredient was not the premium pet food product and ingredient turkey meal but an adulterated mix and blend of hydrolyzed poultry feathers, chicken bone by-product meal, chicken by-product meal and turkey by-product meal that omitted turkey meal;

      c.     On or about March 21, 2014, a shipment, with an approximate weight of 50,840 pounds, from Rosser, Texas, transported through the Eastern District of Missouri, of an animal protein product and ingredient for pet food which was falsely labeled as "Chicken Meal (Low Ash)," when in fact the product and ingredient was not the premium pet food product and ingredient chicken meal but an adulterated mix and blend of hydrolyzed poultry feathers and chicken by-product meal that omitted chicken meal; and

      d.     On or about April 4, 2014, a shipment, with an approximate weight of 50,080 pounds, from Rosser, Texas, transported through the Eastern District of Missouri, of an animal protein product and ingredient for pet food which was falsely labeled as "Chicken Meal (Low Ash)," when in fact the product and ingredient was not the premium pet food product and ingredient chicken meal but an adulterated mix and blend of hydrolyzed poultry feathers and chicken by-product meal that omitted chicken meal.

## V.    DOUG HANING'S GAIN FROM THE SCHEME TO DEFRAUD AND CONSPIRACY

75.    In furtherance of the scheme to defraud and conspiracy in execution of the same, DOUG HANING realized a financial gain from the practice of blending and adulteration.

76.    As a blending facility, the profit to be gained by buying a raw material, such as chicken meal, at market price from a raw material supplier/renderer and then selling essentially the same product at market price would be minimal.

77.    By contrast, the profit margin associated with buying readily available, non-premium products, such as chicken by-product meal and feather meal, and then blending those raw materials together and selling the blended product at a price associated with less-readily available, premium products would be and, in fact, was significant.

78.    Thus, the adulteration and misrepresentations made WE-Rosser profitable over

the course of the scheme to defraud and triggered the deferred payment or "earn-out" provisions agreed to as part of the sale of ABP-Rosser.

79.     The deferred payment "earn-out" targets for WE-Rosser would not have been satisfied absent the margins and profits fraudulently created and realized through the practice of adulteration and mislabeling/misbranding.

80.     On or about February 28, 2013, as a result of the scheme and the conspiracy, a wire transfer in the amount of $4,608,414 was sent reflecting a deferred payment for the benefit of DOUG HANING, and others, pursuant to the terms of the earn-out agreement.

81.     On or about March 24, 2014, as a result of the scheme and the conspiracy, a wire transfer in the amount of $4,391,586 was sent reflecting a deferred payment for the benefit of DOUG HANING, and others, pursuant to the terms of the earn-out agreement.

82.     In addition, between July 2011, and May 2014, DOUG HANING received cash and other indirect payments from Custom AG derived from the sales of WE-Rosser products that were adulterated and misrepresented when shipped.  Those indirect payments included the following checks payable to a DOUG HANING family member from Custom AG:

        a.     Custom AG Commodities check dated January 23, 2012 in the amount of $5,050.00; and

        b.     Custom AG Commodities check dated on or about April 11, 2014 in the amount of $19,200.00.

## Use of the Wires

83.     On or about the dates specified as to each count below, in the Eastern District of Missouri and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so,

**WILLIAM DOUGLAS HANING,**

did knowingly transmit and cause to be transmitted, by means of wire, radio, and television

communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the

purposes of executing such scheme and artifice, as set forth below:

| Count | Approximate Date | Type of Wire Communication | Subject of Wire Communication |
|---|---|---|---|
| 2 | February 20, 2013 | email | Diversified Certificate of Analysis.doc |
| 3 | February 28, 2013 | email | Schedule week of 3/14 |
| 4 | March 6, 2013 | email | BOL CAC2155 |
| 5 | March 6, 2013 | email | CAC2162 |
| 6 | March 6, 2013 | email | CAC4046 |
| 7 | March 6, 2013 | email | CAC4047 |
| 8 | March 6, 2013 | email | CAC4045 |
| 9 | March 6, 2013 | email | CAC2153 |
| 10 | March 7, 2013 | email | BOL CAC2157 |
| 11 | March 7, 2013 | email | BOL CAC2151 |
| 12 | March 7, 2013 | email | Revised schedule for week of 3/4/13 |
| 13 | March 7, 2013 | email | CAC3062 |
| 14 | May 31, 2013 | email | Rosser Schedule |
| 15 | June 27, 2013 | email | FW: questionnaire signed |
| 16 | July 12, 2013 | email | FW: Schedule week of 7-15-13 |
| 17 | July 24, 2013 | email | FW: REVISED SCHEDULE week of 7-22 |
| 18 | August 1, 2013 | email | Schedule for week of 8-6-13 |
| 19 | August 21, 2013 | email | RE: Mishawaka turkey meal |
| 20 | September 12, 2013 | email | COA 9/11/2013 |
| 21 | December 3, 2013 | email | weights and ETAs |
| 22 | December 5, 2013 | email | FW: Updated schedule week of 12/9 |
| 23 | December 13, 2013 | email | weights and ETAs |
| 24 | January 2, 2014 | email | weights and ETAs |
| 25 | January 14, 2014 | email | FW: Revised SCHEDULE WEEK OF 1/13 |
| 26 | February 5, 2014 | email | INVOICES FROM WILBUR ELLIS |
| 27 | March 19, 2014 | email | weights and ETAs |
| 28 | April 15, 2014 | email | weights and ETAs |
| 29 | April 23, 2014 | email | BOL CAC2212 |
| 30 | April 28, 2014 | email | weights and ETAs |
| 31 | April 29, 2014 | email | BOL CAC2240 ADD ON FOR FRIDAY |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1.    Pursuant to Title 18, United States Code, Section 981(a) and Title 28, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Sections 1343 or 1349 as set forth in this Indictment, the defendant(s) shall forfeit to the United States of America any property, real or personal, constituting or derived from any proceeds traceable to such violation(s).

2.    Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to such violation(s).

3.    Specific property subject to forfeiture includes, but is not limited to, the following:

   a.    Approximately 2,705.08 acres of ranch land known as "Living the Dream Ranch" f/k/a "Cactus Ranch," which is comprised of approximately 1,129.93 acres in McMullen County, Texas, and approximately 1,575.15 acres in Live Oak County, Texas, and is situated just north of the southeast corner of said McMullen County and the southwest corner of said Live Oak County, together with all appurtenances, improvements, and attachments thereon.

4.    If any of the property described above, as a result of any act or omission of the defendant:

   a.    cannot be located upon the exercise of due diligence;

   b.    has been transferred or sold to, or deposited with, a third party;

   c.    has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without

difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____

FOREPERSON

JEFFERSON SESSIONS
United States Attorney General
TIMOTHY GARRISON
United States Attorney
WESTERN DISTRICT OF MISSOURI

_____

GILBERT C. SISON, #52346MO
Special Attorney to the United States Attorney General