1                UNITED STATES OF AMERICA
             EASTERN DISTRICT OF MISSOURI
2                  EASTERN DIVISION

3  UNITED STATES OF AMERICA,    )
                         )
4        Plaintiff,    )
                         )
5     vs.            )  No. 4:18-CR-139 RWS/NAB
                         )
6  WILLIAM DOUGLAS HANING,     )
                         )
7        Defendant.    )

8
             TRANSCRIPT OF MOTION HEARING
9
        BEFORE THE HONORABLE NANNETTE A. BAKER
10          UNITED STATES MAGISTRATE JUDGE

11               June 12, 2019

12
  APPEARANCES:
13
  For Plaintiff:      Mr. Charles S. Birmingham
14                 OFFICE OF U.S. ATTORNEY
                  111 S. 10th Street
15                 20th Floor
                  St. Louis, MO  63102
16
  For Defendant:      Mr. Justin K. Gelfand
17                 Mr. William S. Margulis
                  Mr. Ian Talbot Murphy
18                 MARGULIS GELFAND, LLC
                  8000 Maryland Avenue
19                 Suite 420
                  St. Louis, MO  63105
20
  RECORDED BY:        DEPUTY CLERK ALICIA SHEPARD
21
  TRANSCRIBED BY:     SUSAN R. MORAN, RMR, FCRR
22                 Official Court Reporter
                  111 South 10th Street
23                 St. Louis, MO  63102
                  (314) 244-7983
24

25  Proceedings recorded by electronic recording.

1          (The following proceedings were held in open court

2     on June 12, 2019 at 9:33 a.m.:)

3          THE COURT:  Good morning.  We are on the record in

4     the matter of United States of America versus William Haning.

5     This is Cause No. 4:18-CR-139.  And I set this hearing today

6     specifically on the defendant's motion to dismiss the

7     superseding indictment on First Amendment grounds.

8          And so I have received briefing on this, and at this

9     time I'd like to proceed with argument.  Are there any other

10    matters before we start with that?  Are there any other

11    matters to discuss at this time?

12         MR. BIRMINGHAM:  Your Honor, we can take up any

13    matters that the Court would like to take up.  I'd say I

14    would at least ask for argument on the motion to dismiss

15    based on the Whitaker issues and the --

16         THE COURT:  Oh, that's --

17         MR. BIRMINGHAM:  -- disqualification.

18         MR. GELFAND:  (INAUDIBLE.)

19         MR. BIRMINGHAM:  And then the only other matter that

20    wasn't stated on the submission was the First Amendment

21    matter.

22         MR. GELFAND:  And to the extent that the Court -- we

23    are prepared to address the statute of limitations issue.

24    Obviously if the Court would prefer not to hear argument on

25    that, we're fine with that as well.

1          THE COURT:  Okay.  All right.  Well, then why don't

2     we start with the Whitaker issue then.

3          MR. BIRMINGHAM:  Whatever you prefer.

4          MR. GELFAND:  I think it would make more sense to

5     start with the -- well, whatever the Court prefers.

6          THE COURT:  Whatever you prefer.  Why don't we -- I

7     won't say that very often ever.

8          MR. GELFAND:  Famous last words.  Sure.  We can

9     start with kind of the threshold motion to dismiss.

10          THE COURT:  Okay.  Right.

11          MR. GELFAND:  As we briefed pretty extensively, Your

12     Honor, we're not going to rehash the briefs.  Obviously the

13     Court has extensive briefing from us on this issue.

14          Where we would ask the Court to start is to assess

15     whether this prosecution, which is being controlled,

16     undisputedly controlled by U.S. Attorney for the Western

17     District of Missouri, Timothy Garrison, whether that comports

18     with the statutory scheme and the mandate of *Sigilitto*

19     because we believe --

20          MR. BIRMINGHAM:  I'm sorry, Your Honor, I thought we

21     were taking up the First Amendment first.  Are we doing

22     the --

23          THE COURT:  No, we can do this one first.

24          MR. BIRMINGHAM:  I apologize.  I pulled out the

25     wrong file.

1          THE COURT:  All right.  Not a problem.

2          MR. BIRMINGHAM:  Thank you.

3          MR. GELFAND:  Okay.  We believe that the law is

4     clear, both the statutory scheme that we cited and the

5     *Sigilitto* case.  And one of the interesting observations here

6     is that as the Court is aware, we filed an extensive 27-page

7     or so brief analyzing this motion, a large chunk of which was

8     dedicated to this particular issue, which we believe is a

9     threshold issue.  It's a jurisdictional issue, does this

10    prosecution comport with statutory jurisdiction?

11         And this is an issue that the government -- somewhat

12    surprising in its page and a half response basically said we

13    rest on our pleadings.  But the government has never actually

14    addressed this issue in any of its pleadings.

15         What this issue boils down to is the following:  The

16    evidence, in particular Mr. Porter's testimony, is undisputed

17    that Mr. Garrison has never been appointed a Special Attorney

18    and has never taken an oath consistent with Section 515.  The

19    reason that this matters fundamentally is because even

20    Mr. Porter admitted himself that the oath that he took and

21    the Special Attorney appointment that he took, albeit very

22    late in the game in this litigation for him, was different

23    from the oath that he took as an AUSA or from the appointment

24    authority that he has just being an AUSA.  And as the Eighth

25    Circuit analyzed clearly in *Sigilitto*, Section 547 says that

1    a U.S. Attorney only has authority to prosecute within his

2    district.   That's the statutory language.

3         The only exception to that is if the U.S. Attorney,

4    him or herself, has been appointed a Special Attorney

5    consistent with the statutory scheme of Section 515.  What

6    the Eighth Circuit says in *Sigilitto* where this challenge was

7    raised, albeit at a different stage in the proceedings, in

8    *Sigilitto* as the Court is aware, this was actually not raised

9    until appeal.  But the Court still considered it on the

10   merits on appeal because the Court accurately found that it

11   was a jurisdictional issue, that as I understand the

12   jurisdictional issues can basically be raised at any time,

13   you don't get into plain error or harmless error, clear

14   error, those kinds of considerations.

15        And what the Eighth Circuit said is because the U.S.

16   Attorney in that case, who was Beth Phillips at that time, in

17   the Western District of Missouri, was a Special Attorney

18   under 515, then the normal kind of presumption

19   congressionally of Section 547 that she can't prosecute in

20   the Eastern District of Missouri or outside the Western

21   District essentially doesn't apply because she was appointed

22   a Special Attorney.

23        The government's only response to this binding legal

24   authority has been quite simply the Eighth Circuit made a

25   mistake.  We have two very important responses on this that

1   really strike at the heart of this issue.  No. 1, I think

2   it's fair to state simply that this Court is not in a

3   position to make a factual finding that binding legal

4   authority in the holding of *Sigilitto* on this issue doesn't

5   apply based on this Court's fact finding when *Sigilitto* isn't

6   even before this Court and those facts are not before this

7   Court.

8           But there's a second issue that really –– to me

9   really just gets to the heart of this issue, which is let's

10  even assume for the sake of this bizarre discussion that the

11  Eighth Circuit was factually wrong, that Beth Phillips was

12  not a Special Attorney, even though the Eighth Circuit said

13  because she was a Special Attorney under 515 then the Court

14  had –– the government had jurisdiction to prosecute.

15          There's no way that you can read the Eighth

16  Circuit's holding in that case as standing for the

17  proposition that Beth Phillips did not need to be a Special

18  Attorney.  In other words, even if the Court was factually

19  mistaken, the holding still stands completely intact.  The

20  Eighth Circuit obviously was under the belief, presumably

21  based on the oral argument that we all heard in court, that

22  Beth Phillips was a Special Attorney.  And the Eighth Circuit

23  said because that was the case, 547 doesn't limit her

24  jurisdiction to prosecute to her district.

25          The same analysis holds true here.  And what I want

1    to emphasize is that there's literally no evidence before

2    this Court that disputes the two important factual premises

3    that Mr. Porter admitted under oath.  No. 1, Garrison has

4    never been a Special Attorney in connection with this case,

5    is not, he hasn't been, he wasn't when he authorized the

6    indictment, when he's considered major procedural questions

7    such as plea negotiations, motion practice, what charges to

8    file, things like that.  No. 2, he's never taken an oath.

9    Both of which are required under Section 515.

10           And so under that issue we believe that there are

11   statutes that control this question that weigh in our favor.

12   There are binding -- there is a binding case, *Sigilitto*, that

13   clearly supports our position.  The government has not cited

14   a single case, statute, regulation, anything at all to

15   essentially beat this argument.  And the government has been

16   for whatever reason basically dodging this argument through

17   the pleadings.

18           I know that the Court has perhaps been a little bit

19   tortured by pleading after pleading after pleading in this

20   case, but if the Court looks back at all of the pleadings and

21   the responses, we consistently raised this argument from the

22   beginning, and it was consistently curiously ignored.  We

23   even kept filing reply briefs saying what's the justification

24   for that.  We asked Mr. Porter those questions as factual

25   matters, and we established what we need to prove to win this

1    motion to dismiss on those grounds.

2            If the Court agrees with us on that position, then I

3    would submit the Court doesn't even have to get into the

4    appointments clause issue or the disqualification issue.

5            But just to deal with those issues, the appointments

6    clause issue I believe is briefed fairly extensively.

7    Mr. Whitaker had the statutory -- there's two things I want

8    to just emphasize on that beyond kind of the 30,000 feet in

9    the air constitutional issues.  And No. 1, Mr. Whitaker by

10   statute had the obligation of directing and supervising this

11   prosecution.

12           This is a different kind of case than the lion's

13   share of cases that stand before this Court.  And what makes

14   this case different is that this case is at least purportedly

15   being prosecuted under the authority of the Attorney General

16   by Special Attorneys to the Attorney General as opposed to

17   under the authority of a U.S. Attorney within his or her

18   district under the -- in other words, by AUSAs.  Putting

19   aside pleadings that say AUSA or grand jury subpoenas that

20   say AUSAs, the government's bottom line position in this case

21   is we are prosecuting this under the authority of the

22   Attorney General.

23           And, first of all, they've actually claimed that the

24   Attorney General has nothing to do with this, which violates

25   the statutory scheme.  But, second of all, they are claiming,

1    and this goes back to that first argument, that the first --

2    that Mr. Garrison is essentially the head of the snake, that

3    the buck stops there.  They've made that crystal clear

4    throughout their litigation on this issue.  And that strikes

5    at the heart of the appointments clause issue.  The reason

6    why is because at some point a Presidentially appointed

7    Senate confirmed official, principle officer to use the term

8    of art in the case law, needs to be in charge of

9    prosecutions, federal prosecutions in the United States.  And

10    Congress limited that authority by statute with the 547, 515,

11    543 statutory scheme that we've addressed and that we've

12    briefed.

13         And so in this case if Whitaker was not properly

14    installed, in other words, properly appointed consistent with

15    the constitutional mandate that he be Presidentially

16    appointed and Senate confirmed, Whitaker was in charge when

17    the superseding indictment that's currently the operative

18    charging document in this case was handed down and was

19    authorized.  And the government doesn't get it both ways.

20    They don't get to say, well, Whitaker had nothing to do with

21    that so we essentially survived this appointment's clause

22    challenge.  Because it begs the question, who is the

23    principle officer supervising this prosecution?

24         And one of the concerns that's been raised is the

25    government has said because they didn't want the answer to be

1    Whitaker during the time period when Whitaker -- which was

2    significant when Whitaker -- for this case chronologically,

3    they didn't want it to be the Attorney General or the Acting

4    Attorney General, Mr. Whitaker, they wanted it to be

5    Mr. Garrison.  But then we get into the fact that Garrison

6    doesn't have the authority to prosecute under *Sigilitto* and

7    under 515.

8         And so we understand that some courts in completely

9    different contexts have said that the appointments clause

10   challenge essentially doesn't prevail.  We understand that at

11   the District Court level that's happened.  I believe it was

12   the Third Circuit for all intents and purposes, and I don't

13   mean this critically, basically dodged the question saying it

14   wasn't properly preserved.  And at the appellate level I

15   don't believe it's been addressed yet.  It's inevitable that

16   it will be at some point.

17        But at its core this case is different because it's

18   being purportedly prosecuted by a Special Attorney as to the

19   Attorney General.  And it begs the question of who the

20   principle officer is overseeing this prosecution in ways that

21   all of those other cases don't.  And so it's a legal -- at

22   the very least it's a factual distinction and we think it's a

23   legal distinction that matters.

24        The third issue is the disqualification issue

25   regarding a part of the prosecution team in this case, in

11

1   particular now because one has obviously become a judge and

2   is no longer prosecuting this case, now Mr. Birmingham and

3   Mr. Bateman.  We've briefed this extensively.  There's more

4   evidence that obviously we wanted to introduce to the Court.

5   The Court has obviously limited us to calling as far as

6   members of the prosecution team as witnesses to calling

7   Mr. Porter.  The Court initially denied our request to call

8   Mr. Bateman and subsequently denied our request to call

9   Mr. Birmingham.

10          We believe there are multiple kinds of conflicts

11  that arise, all of which are direct conflicts.  There's no

12  dispute factually in this record that United States Attorney

13  Jensen previously represented Doug Haning and Wilbur-Ellis,

14  who is for all intents and purposes a witness against Doug

15  Haning in this prosecution.  There's also no dispute, and

16  even the Court can take judicial notice on this fact, that

17  Assistant U.S. Attorneys Birmingham and Bateman work

18  full-time, other than perhaps for purposes of this case, if

19  you vie that distinction under the S subordinates of

20  Mr. Jensen currently.

21          And as a practical matter, we know that the

22  government's response initially to this whole argument --

23  their whole response initially, this was an office wide

24  recusal.  Their whole response initially was, look, we had a

25  recusal policy, the recusal policy essentially, you know, the

12

1    Court should uphold.  We then introduced evidence after

2    evidence after evidence that the government has failed to

3    adhere to the terms of its own recusal policy, and in

4    non-insignificant ways.

5            Every single grand jury subpoena, between 50 and 100

6    that was represented to the Court by the government, were

7    issued without any clue at all or suggestion on the face of

8    the subpoenas that anyone other than the United States

9    Attorney's Office in the Eastern District of Missouri was

10   investigating and prosecuting this case.

11           The pleadings that were filed in this case were

12   filed essentially haphazardly, sometimes by the same

13   individuals claiming to be Special Attorneys to the Attorney

14   General, sometimes by the same individuals claiming to be

15   Assistant United States Attorneys.  There were people

16   involved in even filing pleadings in this and the related

17   litigation for which the entire office was recused that

18   should never have even had access to documents in connection

19   with this case.

20           And what this boils down to is that they've handled

21   this case no different from every other case in the Eastern

22   District of Missouri.  And that's crystal clear.  The reason

23   that matters is because that becomes an actual conflict in

24   the same way that it's not an office-wide recusal.  They are

25   prosecuting this case the way that they prosecute every other

1    case in the Eastern District of Missouri.  The Eastern

2    District of Missouri is headed by Doug Haning's former

3    attorney in this case, not even in some abstract unrelated

4    matter which would itself still rise to the same analysis.

5           But in this actual case there were communications

6    between Mr. Birmingham and Mr. Jensen about this case when

7    Mr. Jensen was Doug Haning's attorney.  And Mr. Jensen in

8    this case, and we appreciate that the Court, you know,

9    indicated that it wouldn't consider the substance of it

10   because he hasn't been here subject to cross-examination, but

11   Mr. Porter testified that he even got Mr. Jensen to sign an

12   affidavit that he wrote -- or declaration that he wrote.  And

13   Mr. Jensen is now basically a witness for all intents and

14   purposes against Mr. Haning, at least as it applies to the

15   pretrial motion stage of this case.  This is not a case that

16   anyone in Mr. Jensen's office should be prosecuting.  This is

17   the United States Department of Justice.  They have

18   prosecutors that if they are properly appointed under 515 and

19   under *Sigilitto* could prosecute this case.  The question as

20   to this narrow issue is whether Mr. Birmingham and

21   Mr. Bateman have to be those prosecutors.

22          The other issue that we raised with the Court, which

23   was not --

24          THE COURT:  Let me just pause right there.

25          MR. GELFAND:  Uh-huh.

 1              THE COURT:  Where is the evidence that there's a

 2    direct conflict with Mr. Bateman and Mr. Birmingham here?  I

 3    think obviously Mr. Jensen is conflicted out.  Yes, they

 4    conflicted out the entire office.  But if you -- if only

 5    Mr. Jensen had the conflict then he has a direct conflict.

 6    And I understand we have lots of evidence that there are, you

 7    know -- how pleadings were signed and that sort of thing, but

 8    I have not seen anything that suggests that there's been

 9    communication between Mr. Birmingham and Bateman and Mr.

10    Jensen about the case or Mr. Jensen had anything to do with

11    how this case is being handled.  Mr. Porter has testified

12    that the Western District is supervising the case.  I guess

13    my question is where is the direct conflict with those two

14    individuals in the office?

15              MR. GELFAND:  A couple of different areas, and

16    there's one answer that applies only to Mr. Birmingham and

17    not to Mr. Bateman to be precise.

18              THE COURT:  Okay.

19              MR. GELFAND:  With respect to both Mr. Bateman and

20    Mr. Birmingham, there's the fact that -- whether they get

21    promoted, whether they have a job tomorrow in Mr. Jensen's

22    office, whether they get the kinds of cases that interest

23    them or whether they can advance in their career, all of

24    those things are up to Mr. Jensen.  And a conflict exists,

25    and I think this is a very important just fundamental premise

15

```
 1    of our argument, Your Honor, that I don't want lost, a
 2    conflict exists even if the people who are conflicted still
 3    act with integrity and properly.  A conflict can still exist
 4    even if everyone subject to that conflict still do their
 5    absolute best to do the right thing.  In other words --
 6          THE COURT:  So in your -- your belief is let's say
 7    we had, you know, all the subpoenas were properly signed, all
 8    the grand jury -- you know, all the grand jury subpoenas, all
 9    the pleadings and everything was under the Western District,
10    we never had any issues with that sort of thing.  Is it your
11    belief that just because these prosecutors work in that
12    office, say there's no evidence that there's a problem with
13    the carve-out that they've done, just because they continue
14    to work in the office where Mr. Jensen is the U.S. Attorney,
15    there's still a conflict?
16          MR. GELFAND:  Yes, Your Honor.  But I think our
17    argument is much stronger based on what's actually --
18          THE COURT:  I know, but I'm just --
19          MR. GELFAND:  Yes.  Yes.
20          THE COURT:  Because no matter what they are still
21    working -- they are still Assistant United States Attorneys
22    in the Eastern District of Missouri even if in this case they
23    are supervised by the Western District.
24          MR. GELFAND:  Yes.  And let me draw an example.
25          THE COURT:  And because of that you believe that
```

1    there is a conflict.

2         MR. GELFAND:  Yes, Your Honor.  But let me draw an

3    example.  One of the theoretical things in this case that a

4    prosecutor could do is say hypothetically -- and I'm not

5    asking the Court to speculate about facts in the case.  But

6    hypothetically a prosecutor could say, you know what,

7    Wilbur-Ellis who negotiated as the Court is aware essentially

8    a corporate misdemeanor plea, and I don't mean to

9    oversimplify it, but for these hypotheticals I think it's

10   fine to just limit it to that.  A prosecutor now can say, you

11   know what, Wilbur-Ellis represented by the Husch Blackwell

12   law firm kind of played us all along in this case by

13   essentially pointing the finger at individuals who worked at

14   this particular plant instead of just owning the fact that

15   this was a corporate liability situation, and this whole idea

16   that Doug Haning is essentially the patsy is not something

17   that we're going to adhere to anymore.

18        To make that determination, which would be a

19   determination initially made by the lead prosecutor on this

20   case, Mr. Birmingham, what that would effectively amount to

21   is saying our current boss, the head of our office on every

22   other case essentially misled us early on in this

23   investigation with his advocacy because that would be part of

24   that.  I'm not saying in an unethical or improper way, but

25   essentially saying that the lawyering that was done, because

1    the communications would have presumably been through

2    counsel, convinced us to go in a direction with this case

3    that we now realize is not the appropriate direction.

4         The fact that Mr. Birmingham is -- and Mr. Bateman

5    are conflicted in even reaching that determination because

6    Mr. Jensen is their current boss and represented Wilbur-Ellis

7    and Doug Haning, that shouldn't be part of the consideration,

8    that shouldn't be ingredient.  That kind of decision should

9    be made by whether you call them AUSAs or whether you call

10   them Special Attorneys, putting aside that whole issue, they

11   should be made by federal prosecutors who can make that

12   decision based on no considerations at all other than the

13   merits of the case and the controlling law and whatever

14   prosecutorial discretion factors into that.

15        That's not the case with Mr. Birmingham and

16   Mr. Bateman.  That is the case, putting aside any other legal

17   issues, with -- I'm blanking out on Kate's last name and the

18   other Special Attorney -- with Ms. Mahoney and with

19   Mr. Porter.

20        THE COURT:  Porter.

21        MR. GELFAND:  And if Mr. Garrison could

22   jurisdictionally prosecute this case, if he were a Special

23   Attorney, that would be the case with Mr. Garrison.  None of

24   those people looked to Mr. Jensen for whether they advance in

25   their career or whether they get a bonus or whether it's

1    comfortable to walk into the office.  That applies to

2    Mr. Birmingham and Mr. Bateman in a different way.  That's a

3    direct conflict of interest plain and simple.

4         And that really is to some extent one of the

5    dynamics underlying the factual dispute of this case,

6    essentially the underlying factual dispute of what I'm going

7    to loosely call Wilbur-Ellis's kind of version of events

8    versus perhaps employees of Wilbur-Ellis's version of events.

9         And because of that I think the fact that they then

10   essentially took this whole thing saying, well, even if you

11   isolate these two, in other words, even if you kind of forget

12   about that consideration, which I think is determinative, and

13   then these people are at least accountable to the Western

14   District of Missouri, this carve-out, the processes, what we

15   know from the evidence is that it didn't happen the way that

16   it should happen.  And that only makes the disqualification

17   argument stronger for Mr. Haning in this case because that

18   shouldn't have happened.

19        The other issue to answer the Court's question that

20   doesn't apply to Mr. Bateman but at least factually applies

21   to Mr. Birmingham, which was brought to our attention very

22   late in the game, we did mention it in our briefs, is that

23   it's our understanding that Mr. Birmingham's spouse is an

24   employee of the Husch Blackwell law firm.  And that's a

25   direct personal conflict in the same way as our hypothetical

19

1    because there's considerations there that don't apply to

2    lawyers whose spouses do not work for those that represent

3    parties to this lawsuit.  I mean, that's the kind of thing.

4              Interestingly enough in *Sigilitto*, and this was not

5    the Court talking, this was the U.S. Attorney's Office

6    talking, the only reason there was essentially an office-wide

7    conflict with a carve-out by the U.S. Attorney's Office is

8    because at the time Criminal Chief Crowe's, as I understand

9    it, cousin or some more distant relative was a potential

10   witness in the case, but not the eye witness that's going to

11   say "I saw this," but in theory it would put this office in

12   the Eastern District of Missouri in a position to question a

13   potential witness.  It was too close to home, it was

14   uncomfortable.  And they appropriately recused the office and

15   themselves.  That was much more distant than the spouse of a

16   prosecutor working for the attorneys that are still

17   advocating on behalf of a witness in this case against our

18   client.

19             And when that prosecutor is in a position to have to

20   evaluate do I believe Wilbur-Ellis and what they are telling

21   me, can I say, you know what, I don't buy what Wilbur-Ellis's

22   counsel has been told to me.  There are considerations there

23   that I want to be crystal clear, that conflict exists and

24   it's personal and it's direct irrespective of whether anybody

25   does anything improper to carry it out.  In other words, this

1    Court does not have to conclude, and we are not in a position

2    to factually allege, we're not alleging that, you know,

3    Mr. Birmingham and his wife did anything improper as it

4    applies to this case, but the employment relationships and

5    the marital relationships alone, if we're right on that

6    understanding that she was a paralegal at Husch or is a

7    paralegal at Husch during the pendency of this case, that

8    conflict applies uniquely to Mr. Birmingham in a way that

9    doesn't apply to Mr. Bateman and needs to be a part of this

10   analysis.

11          Obviously the reason we don't have evidence to refer

12   to, and I feel obliged to say this as to some of these

13   issues, is not for our lack of trying.  We certainly -- there

14   are things that remain unexplained that only Mr. Birmingham

15   is really in a position to explain.  And when it comes to

16   whether there were, as the Court asked, were there

17   communications between Mr. Jensen and Mr. Bateman or

18   Mr. Birmingham, no one who is in a -- with any firsthand

19   knowledge has testified as to whether there were or there

20   weren't and we haven't been permitted to ask anyone with

21   firsthand knowledge as to that.

22          And so there's a bunch of loaded assumptions that

23   underlie this theory that deference to us, we're the

24   executive, we get to do what we want.  And that's the

25   problem.

1          But, again, I would just bring this Court back to

2   the statutory *Sigilitto* issue.  We believe that we should

3   prevail on the 515 *Sigilitto* issue, and that that doesn't

4   require the Court to go any further because that means that

5   this prosecution, at least as it currently stands, lacks

6   jurisdiction.

7          THE COURT:  All right.  Would you like to address

8   those issues, Mr. Birmingham?

9          MR. BIRMINGHAM:  Thank you, Your Honor.  Good

10  morning again, Your Honor.

11         THE COURT:  Good morning.

12         MR. BIRMINGHAM:  When I was before the Court in

13  December of last year I informed the Court as to the

14  defendant's motions to dismiss the indictment and the

15  alternative relief for disqualification of Special Attorneys

16  to the United States Attorney General appointed myself, Gil

17  Sison, and Kyle Bateman.  I told the Court that and

18  represented to the Court that an evidentiary hearing wasn't

19  necessary, the matter, the issue was disposed -- may be

20  disposed of and should be disposed of based on the

21  appointments on file with the clerk and that had been

22  presented to the Court.

23         I will just use myself as the example but the

24  arguments apply equally to Mr. Bateman and to Mr. Sison up to

25  the point where he left the U.S. Attorney's Office and was no

1    longer a Special Attorney based on his ascension to

2    magistrate judge in Illinois.

3            Your Honor, I was appointed as a Special Attorney to

4    the United States Attorney General pursuant to 28 U.S.C. 515.

5    That is an appointment that is on file.  It includes not only

6    the requisite oath of office but also the conditions of

7    employment.  And I do want to briefly -- and I'm hoping I can

8    be much more brief than Mr. Gelfand and hopefully get us

9    across the finish line on a lot of these issues.

10           But the appointment itself identifies the statute,

11   28 U.S.C. 515, and it says, "Subject to the terms and

12   conditions set forth below, you -- meaning myself -- Charles

13   S. Birmingham, Assistant United States Attorney, Eastern

14   District of Missouri, you are authorized to file informations

15   and to conduct in the Eastern District of Missouri any kind

16   of legal proceedings, civil or criminal, including grand jury

17   proceedings and proceedings before the United States

18   Magistrates which United States Attorneys are authorized to

19   conduct."  It talks about the terms and conditions of the

20   appointment.  And specifically in paragraph 2 of the

21   appointment letter, "With regard to all matters handled by

22   U.S. Special Attorney, you will report to and act under the

23   direction of the United States Attorney General or his

24   delegee, the United States Attorney for the Western District

25   of Missouri."

1          That is the authority of which I've operated when

2     I've been before you in the parallel misdemeanor case

3     involving Wilbur-Ellis, Diversified Ingredients, Henry

4     Rychlik, and Colin McAtee, in which I was before you in

5     reference to Mr. McKinney and the information and the felony

6     guilty plea that subsequently went to Judge Sippel.

7          I am operating under the Attorney General's

8     authority and the delegee, Western District of Missouri.  I

9     was given very specific parameters as to what that meant, and

10    I informed the Court of what those parameters were back when

11    this issue was raised by Diversified Ingredients in the

12    misdemeanor case, is that I'm going to report to the Western

13    District of Missouri as to indictments, guilty pleas, search

14    warrants.  They are going to be directing and I'm going to be

15    reporting to them as the Attorney General's delegee.

16          THE COURT:  But Mr. Garrison from the Western

17    District was never appointed as Special Attorney, correct?

18    And is it your position that that was not necessary?

19          MR. BIRMINGHAM:  I don't want to litigate the

20    *Sigilitto* issue, but I can tell you he was not appointed a

21    Special Attorney.  And I can't see anything in the statutory

22    scheme that would require the political appointee to be

23    subject to the same conditions as myself.  In other words, if

24    you appoint a Special Attorney in the language of the statute

25    and the appointment, it gives me the authority, same

24

1    authority which United States Attorneys are authorized by law

2    to conduct.  So in my simplistic analysis of it, that

3    Assistant U.S. Attorneys, if they wanted to appear in this

4    district, Kate Mahoney, myself, Kyle Bateman, we're going to

5    need to get an appointment that we are now Special Attorneys

6    to the Attorney General.  Separate and apart from that I

7    think there's the U.S. Attorney.  Now --

8          THE COURT:  So do you think then that Mr. Garrison

9    has the jurisdiction to prosecute cases here in the Eastern

10   District?

11         MR. BIRMINGHAM:  I think in this instance the way I

12   read the statute is the indictment that was returned by the

13   grand jury was presented by duly appointed Special Attorneys;

14   specifically Mr. Sison, Mr. Bateman, and myself.  Mr. Sison

15   signed both as the representative, duly authorized

16   representative for the United States, both the indictment and

17   superseding indictment.  And that's consistent with our

18   appointment that those indictments were approved of and

19   reviewed by the Western District of Missouri.

20         As the delegee for the Attorney General, at least in

21   my estimation in terms of the only reason why we're here is

22   whether or not to dismiss an indictment, the indictment was

23   returned at, you know -- subject and in coordination with the

24   prosecution that was conducted by myself, Mr. Sison, and

25   Mr. Bateman as Special Attorneys to the Attorney General.

1          So at least what I'm saying is we are Special

2   Attorneys to the United States Attorney General.  We've

3   been those attorneys since November of 2017.  It's a two-year

4   appointment.  And it can be withdrawn or terminated without

5   notice at any time by the Attorney General's office.

6          THE COURT:  Okay.  So then that leads us to the

7   question regarding the appointments clause then.

8          MR. BIRMINGHAM:  I think the best I can tell you,

9   Your Honor, is that when we were here in January, the Court

10   indicated that it was persuaded by the opinions or at least

11   the one opinion that came out of --

12          THE COURT:  Texas I believe.

13          MR. BIRMINGHAM:  -- the Western District of Texas,

14   *Valencia.*  I revisited that opinion, and I think -- I did

15   want to highlight two aspects of that I think help dispose of

16   the issue.  On page 9 of that opinion, the decisions that

17   kind of go or the statutory scheme are they in conflict or

18   are they acting in concert, do they foreclose or do they

19   expand, the Court concluded:  "The decisions provide strong

20   support for the idea borne out of the plain text of the

21   statutes are not in conflict and thus the appointment of

22   Whitaker is valid under 3345."

23          But I think more importantly in resolving this

24   matter is the Court goes on in the section, "Regardless of

25   statutory conflict there is an Acting Attorney General who

1    has authority to prosecute."  And the Court said and held,

2    "Even if the Court assumes the defendants are correct and

3    that the statutes are in conflict, there would still be an

4    Acting Attorney General would have the authority to prosecute

5    this case.  28 U.S.C. 508 is self-enforcing, meaning that

6    even if the statutes were found to be in conflict and

7    Whitaker's appointment was found to violate 508, the Acting

8    Attorney General under that section in accordance with the

9    line of succession would have the requisite authority to

10   oversee this prosecution regardless of his or her presently

11   delegated duties."

12           So from my standpoint, Your Honor, I take my

13   appointment to be Special Attorney for the United States

14   Attorney General.  It was the deputy -- Assistant Deputy

15   Attorney General I believe that authorized the appointment,

16   but any delegated officer can authorize the appointment for

17   the Attorney General.  And my marching orders were, you're

18   going to be a Special Attorney for the United States Attorney

19   General, you're going to report -- of course the Attorney

20   General still maintains jurisdiction over it.  There was a

21   subsequent recusal notification where Milton McDaniel was

22   added six months later, so ultimately the Attorney General

23   always had authority, never lost authority from a

24   jurisdictional standpoint.  But I was told that I was going

25   to report and be supervised and directed by the Attorney

27

1    General's delegee.  So in this instance to me that is the

2    only thing that really mattered.  Was the Western District

3    designated as the delegee as opposed to some other district,

4    some other supervisory scheme or if the Attorney General

5    or -- not that they would, but if the Attorney General called

6    me tomorrow, it would be that, well, I'm not talking to you,

7    the Western District has the case, it's the Attorney General.

8    I'm the Special Attorney of the Attorney General of the

9    United States and I'm reporting to this express delegee for

10   the Attorney General, the Western District of Missouri.

11         Now, my interactions with the Western District of

12   Missouri as you can imagine are limited just like they would

13   be in any U.S. Attorney's Office.  I report to the white

14   collar supervisor, Kate Mahoney.  And I report to Gene Porter

15   as the criminal chief.  They have dialogues with the U.S.

16   Attorney, whoever the political appointee is at the time or

17   isn't at the time.  Those have all changed over the course of

18   three years in terms of who was the attorney, who was acting

19   attorney, just like they've changed in the Eastern District

20   of Missouri from Rich Callahan to Acting U.S. Attorney Carrie

21   Costantin to now Jeff Jensen.

22         Those movements in no way deprived the United States

23   of jurisdictional authority to prosecute these crimes.  And

24   if it's a jurisdictional argument, that is I believe what the

25   *Valencia* court was saying, however you want to look at the

28

1    statutes, it was never a moment where the United States lost

2    authority, jurisdiction to prosecute the case.  And given

3    that my appointment is that of Special Attorney to the United

4    States Attorney General, in my estimation that's dispositive.

5    In other words, if they are wanting to dismiss by virtue of

6    authority or lack of authority, it goes back to the

7    appointment, and the appointment remains in effect.

8         I don't believe whether Gene Porter, for instance,

9    whether he was a Special Attorney when his appointment, his

10   timing, all that may have some interest within the DOJ and

11   how they want to have certain things taken care of.  But in

12   terms of this indictment and in terms of what authority was

13   on file with the Court and has been on file with the Court,

14   the authority is proper, it is exactly what we told the Court

15   was going to be in the case, that we were going to proceed

16   but under the direction of the Western District because the

17   Western District was identified as the Attorney General's

18   delegee.  That is what is authorized by the Attorney General,

19   and it can't be disturbed by virtue of defendant's motion.

20   It certainly isn't disturbed by interim appointments, whether

21   it's Acting U.S. Attorney in the Western District or Acting

22   Attorney Generals at the Department of Justice.  And we point

23   out --

24        THE COURT:  Just so -- because I want to get the

25   timing and everything, so you were appointed under the

1   Attorney General or their delegee.  And at that point the

2   Western District was identified as the delegee for you being

3   a Special Attorney, you, Mr. Bateman, and Mr. Sison being

4   Special Attorneys, correct?

5           MR. BIRMINGHAM:  Correct, and that was November 14,

6   2017.

7           THE COURT:  Okay.  And at that time was there anyone

8   from the Western District appointed as a Special Attorney?

9   That happened later, correct?

10          MR. BIRMINGHAM:  No, Your Honor.

11          THE COURT:  So the --

12          MR. BIRMINGHAM:  I'm saying yes -- Kate Mahoney

13  contemporaneous with the appointment.

14          THE COURT:  Was also appointed in November of 2017?

15          MR. BIRMINGHAM:  Correct.

16          THE COURT:  Okay.

17          MR. BIRMINGHAM:  So all four appointments, I don't

18  want to say exactly the same day --

19          THE COURT:  Okay.

20          MR. BIRMINGHAM:  -- but when -- and I believe the

21  idea of the appointment was if you were going to appear in

22  the Eastern District.

23          THE COURT:  Right.

24          MR. BIRMINGHAM:  And that there --

25          THE COURT:  That's why Mr. Porter got appointed

1     later once --

2              MR. BIRMINGHAM:  Right.  And maybe it was the wisdom

3     of the idea was the best evidence that we're being supervised

4     by the Western District to me was if the criminal chief came

5     to the Court and represented that, yes, we reviewed the

6     indictments, we were supervising him, we've analyzed all the

7     evidence independently, and we approved the guilty pleas, the

8     indictments, the search warrants.  And so that's why he felt

9     it was appropriate to go then seek out that Special Attorney

10    -- not because he couldn't supervise from the Western

11    District or weigh in on these matters, because the Western

12    District and the U.S. Attorney were the designees for the

13    Attorney General.  It was only the mechanism of appearing in

14    the Eastern District.

15             And so in that sense that's why it said the

16    appointment, whether it's necessary or unnecessary for the

17    U.S. Attorney, I don't think is a dispositive issue of

18    whether or not this indictment should be or could be

19    dismissed or in any way affects the authority that was vested

20    in myself, Mr. Bateman, Mr. Sison to act as Special Attorneys

21    to the Attorney General.  So that's why I think that focusing

22    on that aspect of the *Sigilitto* case, whether it was --

23             THE COURT:  So what do you think about the control

24    of the *Sigilitto* case, the Eighth Circuit's decision in

25    *Sigilitto* then?

1          MR. BIRMINGHAM:  I looked at it and I think it was a

2     misplaced comma, in terms of the --

3          THE COURT:  So when I'm writing my opinion I'm going

4     to put in there I think that the Eighth Circuit misplaced a

5     comma.

6          MR. BIRMINGHAM:  I was not going to offer that but

7     you asked for my opinion and so I want to tell you.

8          THE COURT:  I don't know how they feel about that,

9     but okay.

10          MR. BIRMINGHAM:  Here's what I can tell you, Your

11     Honor, because I was in the office with Mr. Holtshouser and

12     Mr. Finneran, and I believe it was more than a witness, but I

13     believe that maybe Jim Crowe's relative was a victim.  And

14     that made it something that the office felt -- so it was a

15     little bit different than simply a witness situation.

16          And I listened to the entire oral argument in

17     *Sigilitto* when this came up.  And I said is there anything

18     that would indicate that the government represented that

19     there was an appointment?  We certainly went back and looked

20     and said was there, in fact, an appointment?  There wasn't,

21     so we vetted those issues.  It didn't come up in the oral

22     argument other than to talk about the assistants that were

23     being discussed specifically; Mr. Holtshouser, Mr. Finneran,

24     how that -- so it wasn't really a question of that.  I think

25     it just for whatever reason it got either lumped in, I'm not

1    saying it wasn't -- all I really cared about was there a

2    representation by the government in *Sigilitto* that there was

3    an appointment.  And I found nothing in the record that

4    indicated that there was such a representation.  That's all I

5    can say.

6              THE COURT:  Okay.

7              MR. BIRMINGHAM:  And I would bring up one other

8    opinion related to Whitaker that was decided close in time

9    out of the Southern District of California, *Penn* and -- *U.S.*

10   *v. Penn and Leppo.*  And I only bring that up because I think

11   when they are talking about jurisdiction and authority, I

12   think it's useful what the Court wrote in its opinion.

13             THE COURT:  What's the cite?

14             MR. BIRMINGHAM:  I'm sorry, it is -- let's see, it's

15   actually -- I pulled it off the District Court.

16   3:16-CR-01695.

17             THE COURT:  Okay.

18             MR. BIRMINGHAM:  And it's the opinion is Document

19   632.  And the case number is 16-CR-1695-BEN.  And it's an

20   order denying defendant's motion to dismiss.  And the Court

21   gets into some of the particular arguments but in its third

22   point, "The authority of a federal grand jury to investigate,

23   accuse, and return a true bill does not flow from the office

24   of the Attorney General.  In fact, it has been said that a

25   federal grand jury acts outside the three branches of

1    government operating beyond the direction of the Justice

2    Department.  The grand jury has its own authority to litigate

3    and accuse as well as stand as a barrier between the

4    government and a citizen."  The Fifth Amendment -- and this

5    is quoting -- "The Fifth Amendment guarantees that no

6    civilian may be brought to trial for an infamous crime unless

7    or -- unless on a presentment or indictment of a grand jury,

8    the end of the quote.  This constitutional guarantee

9    presupposes the investigative body acting independently of

10   either prosecuting attorney or judge whose mission is to

11   clear the innocent no less than bringing to trial those who

12   may be guilty.

13         I flagged this and I thought it was significant just

14   from the standpoint, we are talking about dismissing an

15   indictment returned by a grand jury in the Eastern District

16   of Missouri.

17         And to say that there isn't jurisdiction and to say

18   there isn't authority, I think the litigation in Whitaker and

19   the appointment letters themself dispose of the issue and

20   that's why I said that back in December.  I'd also point out

21   that the statement of appointment conditions are also on file

22   with the clerk and have been presented to the Court.  And it

23   says that -- meaning me specifically on that appointment, but

24   also Gil Sison and Kyle Bateman -- you'll report and act

25   under the direction of USAG or its delegate, the USA for the

94

```
 1    Western District of Missouri.

 2            So when I read it, when I get the appointment, what

 3    are my marching orders, who has the authority?  The Attorney

 4    General says, go ahead, continue on with the case, you're

 5    going to report to the Western District of Missouri, the U.S.

 6    Attorney for the Western District of Missouri.  There's

 7    further directions from their office that Kate Mahoney is

 8    going to be directly supervising the matter.  Gene Porter is

 9    going to be the criminal chief and a counterpart.  The only

10    interaction that I can think of with the actual U.S. Attorney

11    where I would have sought specific approval, obviously

12    Mr. Porter and Ms. Mahoney would have gone up the chain, was

13    there was an 11(c)(1)(C) guilty plea related to Wilbur-Ellis,

14    and that internally in the Western District requires

15    specifically the U.S. Attorney to approve of an 11(c)(1)(C)

16    guilty plea.

17            But beyond that I operate with the -- throughout

18    this case is that the Western District of Missouri is acting

19    as the delegee of the Attorney General.  And the Attorney

20    General is who I'm a Special Attorney to and who authorized

21    me to continue and Mr. Sison and Mr. Bateman to continue on

22    the case, to be the line prosecutors in the case, and

23    authorized us to do anything that a U.S. Attorney could do in

24    the case.  And that's the statute.

25            And so in terms of any kind of conflict, any
```

35

1    statutory inconsistencies, I don't think anything about our

2    appointment and that statute, I don't think any of those

3    issues undermine our appointment or authority to prosecute

4    the case.

5         Your Honor, briefly -- or maybe not so briefly --

6    but let me try to address the multiple points that

7    Mr. Gelfand made on this merged issue of disqualification,

8    conflicts, recusal.  And I'll try to go through them point by

9    point, but maybe a timeline would be helpful.  And if I may

10   begin with that, Your Honor.

11        The prosecution in this matter began under the U.S.

12   Attorney Rich Callahan.  It then moved on to Acting U.S.

13   Attorney Carrie Costantin.  And then when Jeff Jensen was

14   nominated as the political appointee as U.S. Attorney's

15   Office, I did, Carrie Costantin took steps to make sure that

16   before he came into the office he would be walled off from

17   this prosecution.  That was in the fall of 2017.

18        There is no evidence before this Court that Jeff

19   Jensen has been involved in this case as the U.S. Attorney

20   for the Eastern District of Missouri.  None.  The indictment

21   and superseding indictment were signed by the duly appointed

22   Special Attorney Gil Sison.  And I'll tell you, Your Honor, I

23   drafted the indictments.  They were approved at every stage

24   by the Western District of Missouri, specifically Kate

25   Mahoney and Gene Porter.  The confirmation of that fact

56

1    without waiving any of our objections and arguments that

2    we've made regarding the recusal procedure, but we did in

3    good faith bring Kate Mahoney and Gene Porter here to just

4    tell you, tell the Court.

5          When Mr. Gelfand says there's absolutely no evidence

6    that this case is being handled differently than any other

7    case in the Eastern District of Missouri is just simply not

8    borne out by the record.  You had the criminal chief of the

9    Western District of Missouri and the white collar chief for

10   the Western District come in and tell you that no, all the

11   information was provided to the Western District of Missouri,

12   that they specifically reviewed and authorized the indictment

13   of Mr. Haning.  There's numerous other instances from guilty

14   pleas and that I believe was said on the record as well as

15   search warrants that the Western District had reviewed.  So

16   it's not a question, it's not something that remained

17   unanswered.  Before the Court undisputed testimony is the

18   Western District has supervised as a delegee for the Attorney

19   General the prosecution of Doug Haning, reviewed specifically

20   the indictment and the superseding indictment.

21         The conflict issues -- so from that standpoint, Your

22   Honor, when they say that the recusal hasn't happened as

23   represented to the Court, that is factually inaccurate.  What

24   was going to happen did happen as I informed the Court in

25   2017.

1          In terms of the actual conflicts or the assertions

2    by defense as to conflicts, back in 2000 -- early 2016, the

3    file may have come in very late in 2015, but early 2016 is

4    when the case file essentially was opened.  The case itself

5    within it there was an opportunity to review the pleadings in

6    the civil case, the Blue Buffalo filing, meaning Purina,

7    Nestle Purina had sued Blue Buffalo and there was active

8    litigation regarding the case.

9          When I was assigned the case by Reggie Harris, then

10   the white collar chief, I went through and identified are

11   there conflicts, are there potential conflicts, are there

12   issues that we need to be aware of because it's such a large

13   litigation event and it involves multiple attorneys.

14   Obviously with Purina being a large employer as the entity

15   initiating the litigation, that was something we were looking

16   at.

17         We were looking at the multiple law firms that were

18   engaged.  Those law firms; Bryan Cave, Carmody MacDonald,

19   even certainly Husch Blackwell, outside counsels, law firms,

20   Covington for Wilbur-Ellis and Doug Sprague, who has been

21   before the Court, was my primary contact in the criminal

22   matter.  Capes Sokol was representing Blue Digital, a party

23   in the case.  And so that would have been Mr. Margulis, both

24   Art and Bill and I believe Justin Gelfand.  So they were

25   representing -- Capes Sokol was representing Blue Digital.

38

1    Blue Digital was the -- was hired by Nestle to do public

2    relations saying that Blue Buffalo had adulterated products

3    in its pet food and that it had lied to its consumers and so

4    forth.  So Capes Sokol was representing that entity in the

5    litigation.

6          But we went through the list and we -- respectfully,

7    Your Honor, I'll say we have tried to get in front of every

8    potential conflict issue that we have seen.  And I believe

9    we've done that.  In terms of attorneys that were in the

10   case, the one that jumped out was Husch Blackwell.  Husch

11   Blackwell was clearly not the primary attorney, lead

12   attorney, Covington was, but they certainly appeared as

13   operating as local counsel.  As many -- as Sanford Phoenix,

14   there's many, many local counsels in the Blue Buffalo

15   litigation.  But we looked at it, and I can tell you that the

16   Husch Blackwell issue as it has now been brought up was

17   addressed in terms of a family member who is a non-attorney,

18   non-litigation, civil or criminal, who is salaried and not

19   any way financially affected by any of the matters related to

20   the civil or the criminal case.

21         But it was flagged for the Eastern District of

22   Missouri.  Prior to any subpoenas going out to Wilbur-Ellis

23   or Diversified Ingredients or anything like that, it was

24   flagged for Husch Blackwell.  It was -- and a wall -- I've

25   got written confirmation on February 18th that a wall was

1    erected specific to my spouse, that in no way would she have

2    any access to any information in the case.  That happened in

3    February 18th.  I don't know exactly -- February 18th of 2016

4    mind you, Your Honor.  I don't know exactly when Mr. Gelfand

5    says, well, we now learned.  There's certainly billing

6    records from February 18th that were offered, redacted

7    billing records.  Whether or not this was an issue that was

8    kept close to the vest until this moment, I can't tell you.

9         But it was a communication that I flagged for Jeff

10   Jensen as a partner at Wilbur-Ellis that my wife was a

11   paralegal in the intellectual property department at Husch

12   Blackwell.  And their response was they put up an ethical

13   wall.  And that fact was communicated to the ethics officer

14   in the Eastern District of Missouri.  It was communicated to

15   the executive office, the Department of Justice executive

16   office for the United States Attorney prior to my appointment

17   as a Special Attorney to the United States Attorney General.

18   It was specifically communicated to the ethics officers in

19   the Western District of Missouri.

20        I'm completely satisfied that all appropriate steps

21   have been taken.  When this was identified it was identified

22   as not a conflict based upon the analysis that you go

23   through.  Is there a familial connection?  Yes.  But is there

24   any financial aspect of it that would require or rise to the

25   level of conflict or appearance of conflict?  And given the

1    wall, the determination was made that absolutely not.  And

2    that's the way we proceeded since February 2016, before any

3    records were turned over by Wilbur-Ellis pursuant to the

4    government's initial subpoena.

5            In terms of representation by the conflict issue

6    related to Jeff Jensen, I would like to flag out that

7    timeline as well.  It is my understanding that based on my

8    review of the testimony and the evidence presented by the

9    defendant, there is no representation agreement before the

10   Court.  There is nothing that would speak to the scope and

11   the duration of any representation involving Husch Blackwell

12   or Jeff Jensen as it relates to Mr. Haning.  What the Court

13   received was some redacted and then additionally redacted

14   billing records for a time frame in early 2016.  And what the

15   attorney from Husch Blackwell testified said all appropriate

16   conflicts were addressed.  And that month, February 2016,

17   early March of 2016, that 30-day period, was about securing

18   counsel for individual employees at Wilbur-Ellis who the

19   government identified had criminal exposure either as

20   subjects or targets.

21           And I can tell you that in terms of the timeline,

22   February 18th I received a call from an attorney named Bob

23   Gill out of Ft. Worth.  That was followed up by a letter on

24   February 19th, saying that he and his firm represented Doug

25   Haning in all criminal matters.  Jeff Jensen updated me as to

1    other individuals as they got their own attorneys.  I

2    communicated substantively with Mr. Gill on why Mr. Haning

3    was identified as a subject or a target of our investigation

4    as back in February of 2016, including providing checks

5    written from Custom Ag to Mr. Haning's wife, and walking him

6    through the allegations of the civil case and why we thought

7    he had criminal exposure.

8         We ended up then receiving -- I ended up receiving a

9    call from Art Margulis towards the end of February, early

10   March, saying that no, in fact, they were going to take over

11   representation of all the criminal matters related to

12   Mr. Haning.  I met with Bill and Art Margulis on I believe it

13   was March 12th, and they confirmed that they were going to be

14   representing Doug Haning and that it was my -- it was my

15   understanding that securing appropriate counsel, independent

16   counsel, his own counsel had occurred and that Husch

17   Blackwell was not representing Mr. Haning after that.

18        So in terms of a 30-month snapshot, Your Honor, in

19   contrast to the way Mr. Gelfand presents it, we addressed

20   conflicts, we addressed appearances of conflicts.  We tried

21   to get out in front of all these issues early and we believe

22   we did.  We believe we've handled the conflicts in this case

23   appropriately, timely, and sufficiently that there is no

24   prejudice, there has been no prejudice to Mr. Haning in any

25   way.

1          I will tell you that Capes Sokol and attorneys other

2     than the ones seated here today continued to be the firm

3     representing Mr. Haning up until or certainly through October

4     of 2017 when Acting Attorney Carrie Costantin had the case

5     before Mr. Jensen became the U.S. Attorney and after Rich

6     Callahan had been removed.  At that time we specifically

7     informed Mr. Haning's team, civil attorneys, criminal

8     attorneys, including Art Margulis, that he was going to be

9     charged with -- and charges would be sought as to a felony.

10         That occurred prior to Jeff Jensen being U.S.

11    Attorney.  And the charges that we said that we were going to

12    charge were exactly those charges that ultimately came down

13    in the initial indictment, but that was first vetted by the

14    Western District of Missouri.  In other words, we briefed

15    them, provided them the relevant records, provided them all

16    the additional information that they needed to get up to

17    speed, and I believe there was actually a record.  We delayed

18    things.  I said the Western District needs some time to get

19    up to speed on the case so they could independently review

20    those things.

21         So the idea that there was a momentous or even a

22    slight shift in focus of the investigation as to who the

23    primary target was based on Mr. Jensen becoming the U.S.

24    Attorney is just factually inaccurate and Mr. Gelfand and

25    Mr. Margulis and both Mr. Margulis know it.

43

1    There hasn't been any change in the posture and the

2    focus of the investigation since 2016 other than Wilbur-Ellis

3    didn't start out as a subject or a target, nor did

4    Diversified.  The evidence dictated where we needed to go

5    with that.

6        And in terms of the idea of any Assistant U.S.

7    Attorney or Special Attorney evaluating evidence based upon

8    things like promotion or, well, would I have to disbelieve

9    something some criminal defense attorney said, it just

10   doesn't even compute, Your Honor.  I deal with defense

11   attorneys all the time.  Their representations are their

12   representations, but it's ultimately the evidence and the

13   facts that dictate charging decisions and the decision to go

14   before a grand jury.  Which in this case the grand jury heard

15   the evidence.  They made a determination.  Jeff Jensen wasn't

16   in the room; I wasn't in the room.  The grand jury heard it

17   and independently returned an indictment that Mr. Haning now

18   wishes to dismiss.

19       In terms of the recusal, as you know, Your Honor,

20   there are certain aspects of it that I believe just don't

21   sound and whether or not an indictment could be dismissed or

22   attorneys without an actual conflict could be disqualified.

23   But I've always represented I'm happy to answer any questions

24   the Court has.  I'm happy to make a brief record to some of

25   those specific areas of inquiry such as how were files kept,

44

1   whether paper or digital.  How was the office -- I'm happy to

2   do that.  I'll continue to be happy to do that at any point

3   in time.

4           But I will tell you that just generally post

5   notification that I was going to continue working on the

6   case, but that the vast majority of the attorneys in the

7   office were going to be recused.  We took appropriate steps,

8   meaning there was notification to each supervisor in the

9   Eastern District of Missouri that they nor any of the

10  individuals in their department were to work on this matter,

11  that the physical file was marked as a recusal case along

12  with a notification from the Attorney General's office.  The

13  paper files are maintained in a cabinet that are marked

14  recusal.  And I have my own dedicated conference room where

15  those work papers and computers where the agents work are

16  kept.

17          The digital files, as you know, Your Honor, there's

18  roughly just under a million documents, not pages in this

19  case.  So we're not really using paper files like we would.

20  What we have is a digital platform called Relativity that's

21  operated with -- by the Department of Justice Litigation

22  Technology Support Center.  Those in order to open a file you

23  have to designate who has access to those files.  The only

24  individuals that have access to those files since 2017 are

25  those attorneys that -- and agents as it relates to this, the

1    attorneys who were carved out of the recusal.

2         And in terms of our own electronic files, those are

3    created with the same types of protocols, who has access and

4    who doesn't.  We have confirmed that the only individuals

5    that have access to the customatic files in terms of getting

6    on a computer and looking in those files are the attorneys

7    that are on the case.

8         There were two filings that I believe all the

9    proceedings clearly indicate were inadvertent.  At the same

10   time that we sought our search warrant we also did our

11   superseding indictment.  The mechanism for unsealing that

12   superseding indictment, the letter Mr. Sison provided you,

13   Your Honor, made clear that it was a Special Attorney.  I

14   remember calling Mr. Sison to make sure that happened.

15   Unfortunately on the side of the forfeiture, the boilerplate

16   letter that went into that file by Mr. Bateman, we don't even

17   see the copy, it's just provided at the time of the search

18   warrant, and says, all right, it's now the suppression has

19   been lifted.  It was inadvertent.  I believe the Court has

20   said is clearly a mistake by Mr. Bateman.

21        And I believe we fleshed out in our objections that

22   the inadvertent filing by Josh Jones, the reason why it

23   escaped the recusal protocols is there was no file for FLU,

24   the Financial Litigation Unit.  Because as you know, Your

25   Honor, we required Wilbur-Ellis and Diversified, but

1    Wilbur—Ellis to pay all their money within five days.  So

2    there was no thought of, well, the Financial Litigation Unit

3    is going to follow its protocol when there's a collection,

4    open a file.  And so evidently they opened a file only to

5    close it and filed it.  I found that on my own and brought it

6    to the Court's attention as soon as we found out.  But as it

7    reflected, that was months I believe after we stopped looking

8    at the Wilbur—Ellis/Diversified pleadings and the

9    notification really only came out as and appeared like a

10   receipt.  In other words, satisfaction of judgment like I get

11   20 or 30 of those a day on former cases.  Never thought to

12   look on it.  Certainly knew that we had not filed anything.

13          Those were mistakes.  Those were errors.  But in no

14   way do they provide any credible evidence that the Eastern

15   District or Jeff Jensen were actively or in any way involved

16   in prosecuting Mr. Haning.

17          The only other aspect of it in terms of the recusal

18   or issues that came up I believe -- and I think there's a

19   record on it and that's the position of the government, we

20   don't need to relitigate it, but I did offer a stipulation

21   regarding the grand jury subpoenas, which I believe should be

22   sufficient to take that out of the realm of, well, this was

23   somehow indicative of the U.S. Attorney's Office for the

24   Eastern District of Missouri being involved in a grand jury

25   investigation.  I've stipulated that on behalf of the

1    government that for the vast majority of those subpoenas I

2    requested them.  I requested them as a Special Attorney to

3    the United States Attorney General, that it was done and

4    prepared by my assistant, Pat Rockers, who was on the recusal

5    carve out.  And that if there was any kind of question I came

6    in and stipulated to the Court that, no, it was me, it was me

7    acting under the authority as Special Attorney to the

8    Attorney General.  And on its face there's nothing that would

9    suggest otherwise except the address that was used or the

10    title that was used.  And the title and the address, turning

11    us back to our appointment, letters of appointment, those

12    letters of appointment specifically say I will -- Assistant

13    United States Attorney, you're appointed Special Attorney,

14    you will work out of the Eastern District of Missouri, you

15    will not receive any additional compensation, you are

16    instructed to pursue this as and proceed in the Eastern

17    District of Missouri including grand jury matters until your

18    appointment is terminated.  It has not terminated.  The

19    Attorney General, the Western District of Missouri, whoever

20    it is, they continue to present me as representing the United

21    States.  The Attorney General has complete authority on who

22    to determine, delegate, and authorize to handle these

23    criminal proceedings.

24            Mr. Sison was at the time that the indictments were

25    returned, Mr. Bateman was at the time certain search warrants

1    were executed.  And certainly throughout this matter,

2    including five guilty pleas, two judgments, and then the

3    superseding indictments, superseding indictment at all points

4    in time as I've been authorized by the Attorney General of

5    the United States to handle this matter.

6         I believe that's sufficient to dispose of the

7    defendant's motions.  The only things that are before the

8    Court right now, a motion to dismiss a properly returned

9    indictment and to disqualify prosecutors who don't have an

10   actual conflict.

11        THE COURT:  All right.  Thank you for your argument,

12   Mr. Birmingham.  Did you want to now address the First

13   Amendment issue?

14        MR. GELFAND:  I can, Your Honor.  Would the Court

15   permit a very brief reply to some of the things?

16        THE COURT:  I assumed you would want a brief reply.

17   Okay.

18        MR. GELFAND:  First of all, there's a lot of --

19   Mr. Birmingham just said a lot of things.  And at the end if

20   you kind of divide his argument into the disqualification

21   issue versus the statutory and constitutional issues we

22   raised, there's literally no evidence at all that the Court

23   has heard at the evidentiary hearing portion of this

24   proceeding that supports some of the representations that he

25   made.  And for the government to basically take the position

49

 1    throughout these proceedings that, well, Mr. Birmingham

 2    doesn't have any relevant testimony to offer or information

 3    to provide and to actually be subject to questions where we

 4    can inquire on behalf of our client, but then to come in at

 5    the argument phase and basically say let's get the record

 6    straight, here's all the facts I want the Court to consider

 7    to feel comfortable, I don't think is fair to Mr. Haning.  I

 8    would object to it as just a matter of due process.  The

 9    government had every opportunity to put on evidence.  We

10    wanted him to put on evidence that --

11         THE COURT:  You know what, I'm just going to -- I

12    understand that.  What Mr. Birmingham has just said to the

13    Court I am considering as argument.

14         MR. GELFAND:  Fair enough.

15         THE COURT:  I am not going to use any of those

16    representations that he just made about how the office ran or

17    any of that as facts because it wasn't subject to

18    cross-examination.  He was not under oath.  He was just

19    arguing --

20         MR. GELFAND:  Fair enough.

21         THE COURT:  -- his position and that's what I'm

22    taking it for.  Okay.

23         MR. GELFAND:  Fair enough.  The other two things I

24    wanted to address separate and apart from that is that

25    *Sigilitto*, which Mr. Birmingham said he doesn't want to

```
1    litigate that issue, and I can understand why, is not a

2    misplaced comma.  And whether that was said in jest or

3    whether that was said sincerely is really beside the point.

4    Because I want to be very clear, it's not just that the

5    Eighth Circuit said because the U.S. Attorney and the AUSAs

6    were Special Attorneys essentially all is fine

7    jurisdictionally.  They said that after they acknowledged

8    that 547 limits jurisdictional geographic authority unless

9    515 plays into it.  And so --

10          THE COURT:  I hate to cut you short but we're going

11   to figure out what Sigilitto said.  So I understand --

12          MR. GELFAND:  Fair enough.

13          THE COURT:  -- your argument.  You've made the

14   argument.  We've read Sigilitto and read Sigilitto and marked

15   Sigilitto and --

16          MR. GELFAND:  I have no doubt.

17          THE COURT:  -- so we will perform our own analysis

18   of how that plays into this particular case.

19          MR. GELFAND:  The one thing that falls -- big

20   picture, the last thing I want to talk about, which applies

21   to not only Sigilitto's analysis of the statute but the

22   statutes themselves is that there isn't a statutory scheme, a

23   statute or a case, certainly not Sigilitto, that says that

24   there is a distinction between a United States Attorney,

25   quote, unquote, supervising and a United States Attorney's
```

51

1    authority to prosecute.  What the government is essentially

2    suggesting to this Court is that that's what's happening.

3    The irony of where we are now is as to that issue there's

4    really as I understand it not much dispute as to the facts.

5    The question is whether it comports with the statute and with

6    the case law.  And I just wanted to underscore that.

7        With respect to the appointments clause issue in the

8    Texas cases, I just don't want there to be, and I don't think

9    there is, want there to be any confusion.  The conflict of

10   laws that the Court were analyzing in those cases was a

11   conflict between -- at least an alleged conflict, was an

12   argument that the appointment of Mr. Whitaker also violated

13   the Federal Vacancies Reform Act, the FVRA.  It didn't in

14   any -- none of those cases addressed this 515, 547 issue

15   because they weren't issues in those cases because they were

16   intra-district prosecutions by -- at least with properly

17   appointed U.S. Attorneys.  And so I just didn't want there to

18   be any confusion of that.

19       Obviously the Court has the evidence that's before

20   it.  We continue to maintain our position as to all three of

21   our arguments.  But we believe that the statutory and

22   *Sigilitto* argument is clear as day candidly.

23       THE COURT:  All right.  Mr. Birmingham.

24       MR. BIRMINGHAM:  Very quick points.  One, the

25   *Sigilitto* issue, it was somewhat in jest to kind of say that

52

1    it was -- it wasn't a real issue and it was inartfully at

2    least in my estimation flagged.  I made additional

3    representations and I'd ask that the Court rely on those

4    regarding I could not find anything in the record that showed

5    an appointment and therefore it's not part of the record.

6          And I did want to just flag --

7          THE COURT:  You couldn't find anything that showed

8    that that -- I'm sorry, that --

9          MR. BIRMINGHAM:  Beth Phillips.

10         THE COURT:  -- Beth Phillips had been actually

11   appointed as Special Attorney, correct?

12         MR. BIRMINGHAM:  Two.  One certainly can turn --

13         THE COURT:  But for whatever reason the Eighth

14   Circuit believed that to be true and based their decision on

15   that.

16         MR. BIRMINGHAM:  And I wanted to make two points on

17   that.  One independently looking, was she, in fact,

18   appointed.  And, two, was there anything in the record.

19   That's what both Kate Mahoney and I both looked at to see in

20   the oral argument or in the record submitted to the Eighth

21   Circuit that said that.  And that's what I was saying, that I

22   was unable to find anything in oral argument or in the record

23   before the Eighth Circuit that said that Phillips was

24   appointed as Special Attorney.  That's all that I was --

25         THE COURT:  Okay.

53

1            MR. BIRMINGHAM:  -- implying.

2            THE COURT:  Okay.  All right.

3            MR. BIRMINGHAM:  It was just that it came out in the

4    opinion --

5            THE COURT:  Right.

6            MR. BIRMINGHAM:  -- but without linking it to a

7    specific representation of fact in the briefs, that's all I

8    was trying to say.  Two things that I wanted to do when that

9    issue came up was, you know, was she?  No.  Was it

10   represented that she was?  I couldn't find anything in the

11   record.

12           THE COURT:  Okay.

13           MR. BIRMINGHAM:  Nor could Kate Mahoney find

14   anything in the record that said that the government

15   represented that, that's just the way it came out in the

16   opinion.  Certainly there was representations that the

17   Special Attorneys, Holtshouser and Finneran, and I believe

18   the assistant out of the Western District had been appointed.

19   That's where the comma issue came up.  At least in my head,

20   when you asked what do I think happened, I think sometimes

21   people make mistakes.

22           And then the only other thing I did want since it

23   was flagged in their brief, just so you know that I don't

24   think it changes any of the analysis, but my wife is not

25   employed currently at Husch Blackwell.  And so I would just

54

```
 1    offer that as well.  Thank you, Your Honor.

 2             THE COURT:  Okay.

 3             MR. GELFAND:  First Amendment?

 4             THE COURT:  Why don't we take a five-minute break.

 5    Okay.  Let's make it ten minutes.  We'll take a ten-minute

 6    break and we'll come back and do the First Amendment

 7    argument.  Okay.

 8             (Court in recess from 10:58 a.m. until 11:12 a.m.)

 9             THE COURT:  All right.  Mr. Gelfand, you may

10    continue.

11             MR. GELFAND:  Thank you, Your Honor.  Your Honor,

12    with respect to our First Amendment motion, I want to start

13    by talking about what's undisputed as far as premises that

14    are relevant to the analysis.  First of all, it's undisputed

15    that the product that was sold was legal.  In other words, it

16    wasn't contraband like drugs or illegal firearms or something

17    along those lines.  It's undisputed that what was represented

18    to be chicken meal or poultry meal or turkey meal at various

19    points consisted of, for example, the chicken meal, chicken

20    intended to be eaten.  There's a dispute over what the

21    language means based on, quote, unquote, industry

22    definitions, which I'll address, which is at the core of the

23    argument.  But, in other words, nobody is saying that

24    something was represented to be chicken meal when, in fact,

25    it was a cat or a frog.
```

1      And the third thing that's undisputed is that

2  Mr. Haning is being prosecuted for what was said.  In other

3  words, if there was a different label the government would

4  not be alleging a crime.  And so it's not conduct in the

5  sense of the underlying conduct, it's speech itself.  And

6  that strikes at the heart of this issue.

7      I would direct the Court's attention to the Eleventh

8  Circuit's well-reasoned opinion in the *Ocheesee Creamery*

9  case.  And in that case you have a dairy farmer in Florida

10  that wants to call milk where the fat is skimmed, skim milk.

11  The Florida state legislature, even in that state a

12  legislative body, defined skim milk as milk where the fat is

13  skimmed but also where Vitamin A is added, so basically skim

14  milk plus Vitamin A.  The farmer raises a First Amendment

15  challenge in court.  The Eleventh Circuit correctly applies

16  the *Central Hudson* test that is the seminal test for any

17  commercial speech First Amendment issue and holds that this

18  commercial speech is constitutionally protected, that

19  regardless of whether listeners understand skim milk to be

20  skim milk in a pure form or skim milk with Vitamin A added

21  that the speaker has a First Amendment right to objectively

22  say something that just as a matter of English is true.

23      And that prosecuting that farmer would be

24  essentially what this prosecution of Mr. Haning is, because

25  it's a statement of objective fact.  So what this ultimately

56

1    boils down to is that the Florida legislature in the case, as

2    the court correctly held, doesn't get to redefine English.

3    AAFCO, a private trade group, doesn't get to redefine

4    English; the U.S. Attorney's Office doesn't get to redefine

5    English; a grand jury doesn't get to redefine English.  The

6    whole point here is that even though that was not a criminal

7    case, a fundamental First Amendment holding that that

8    objectively truthful commercial speech cannot be regulated

9    applies at least with full force if not more compelling force

10   to the idea that if the government can't regulate that

11   speech, it certainly can't criminalize that speech.

12           And so what this ultimately boils down to is the

13   *Central Hudson* analysis.  What the government curiously does

14   in its response to our motion is basically say *Central Hudson*

15   is beside the point.  The government doesn't engage with

16   *Central Hudson*.  And we cite -- we analyze *Central Hudson* as

17   the seminal Supreme Court case on this issue at great lengths

18   in our motion.  The government actually says it's beside the

19   point.  We cite civil and criminal cases where the courts

20   have correctly applied the *Central Hudson* analysis.  Some

21   courts, some cases the district court and the appellate court

22   applied the *Central Hudson* analysis and reached different

23   conclusions, but the analysis, in other words, the legal

24   analytical paradigm was still the same, which is that *Central*

25   *Hudson* has to be evaluated.

1          And under *Central Hudson*, there's a threshold

2     question and then it's followed by essentially followup

3     questions.  The threshold question is whether the commercial

4     speech itself is entitled to First Amendment protection in

5     the first place.  And that analysis doesn't change because an

6     indictment is pending calling something fraud or because a

7     Florida legislature wants to say you can't do this.  To be

8     afforded the protection of the First Amendment, the speech

9     itself must concern lawful activity for which there is no

10    dispute.  In other words, it's dog food, it's not drugs.  So

11    we easily get past that question.

12         And the speech has to not be inherently misleading.

13    And inherently misleading there's a distinction within the

14    law as between either not misleading at all, potentially

15    misleading, and inherently misleading.  Under the

16    government's theory in this case, if you take an entire

17    chicken; beaks, chicken breast, chicken thighs, feathers, you

18    put it into a blender and you reduce it to a meal intended to

19    be eaten, then you can't call the resulting product, the

20    blend, if you will, chicken meal, even though that's an

21    objectively true statement.  Because everything in it is

22    chicken and it's intended to be eaten, in this case by dogs

23    or by pets.

24         And what this ultimately boils down to, Your Honor,

25    and this is important, it's just like the *Ocheesee Creamery*

58

1    case, is that at most -- and we would underscore at most --

2    the speech is potentially misleading based on the

3    government's whole theory that within this industry, in other

4    words, within this private trade group's kind of definitions,

5    chicken meal has kind of a term of art or a specialized

6    meaning, in the same way that in Florida, by the way, skim

7    milk even by legislative fiat had a specialized meaning.  But

8    to the extent that it's not inherently misleading, which it

9    isn't, and to the extent the conduct itself is not unlawful,

10   which it clearly isn't, then there's a burden shift to the

11   government under the *Central Hudson* test to essentially

12   establish intermediate scrutiny and to apply the *Central*

13   *Hudson* analysis.

14        Where the government fails fatally to their position

15   on this motion is that they don't say under *Central Hudson* we

16   survive, here's evidence or argument or analysis that

17   essentially the government's regulation or criminalization of

18   this speech passes intermediate scrutiny.  Instead the

19   government says *Central Hudson*, that's beside the point.  And

20   so the Court is left where the government now has presented

21   no evidence or even argument in support of an intermediate

22   scrutiny analysis, and that's fatal as a matter of

23   constitutional law.

24        And to address that just briefly, there is no

25   substantial interest, which is the first part -- the *Central*

1    *Hudson* test is essentially an intermediate scrutiny analysis.

2    There's no substantial interest here.  The government doesn't

3    allege and could not allege that any pets were harmed.  The

4    government does not allege and could not allege that this is

5    the least restrictive necessary way of establishing its

6    government interest as intermediate scrutiny requires.  And

7    certainly noncriminal regulations if constitutional would be

8    less extensive and more narrowly tailored to serve whatever

9    the government has.

10            And ultimately what the government has said, they

11   didn't use the phrase AAFCO in the indictment, but what the

12   government is basically saying is AAFCO, this private trade

13   group within the pet food industry, has essentially said

14   chicken meal has a specific meaning, chicken meal blend has a

15   specific meaning.  Turkey meal, poultry meal, so on and so

16   forth.  And they've alleged in the indictment that all of

17   these things have specific meanings within the industry.  But

18   the First Amendment prohibits governmental restrictions on

19   speech based on essentially redefining what English terms

20   mean there.

21            What's important about our motion, which I want the

22   Court to understand, is that what the government has

23   essentially said is you can raise this at trial, of course.

24   The government has essentially said, you know, they call it

25   an affirmative defense.  We might dispute on whether it's

60

1    actually a burden shifting affirmative defense, but that's

2    not before this Court and neither here nor there.

3         But what's important to realize is that our motion

4    is predicated on accepting the -- for limited purpose of this

5    motion, on accepting the allegations in the indictment at

6    their face value.  In other words, we're not asking -- if the

7    indictment alleged that Mr. Haning called a blend consisting

8    of frogs chicken meal, assuming, you know, materiality and

9    all the other stuff that might be hyper-technical, this

10   wouldn't be an appropriate pretrial motion.  There might be

11   an argument at trial that it's not material.  There might be

12   certain things, but the point here is that what the

13   government is alleging here and conceding what the facts bear

14   based on the discovery in the case is that when chicken meal

15   is called chicken meal it consists entirely of chicken and

16   tended to be eaten.  When turkey meal is called turkey meal,

17   it consists entirely of turkey intended to be eaten.

18        The only question before this Court is whether the

19   government can subject a person to a federal criminal trial

20   and a jury determination that an objectively true statement

21   such as the ones that the government is alleging Mr. Haning

22   made is, in fact, a quote, unquote, fraudulent or untrue

23   statement solely because there is a different meaning to the

24   listener potentially within kind of the industry.  And that's

25   where we would ask the Court to adopt the reasoning of the

61

1   Eleventh Circuit in *Ocheesee Creamery.*

2          Just to be clear, we're not pointing the Court to

3   the Eleventh Circuit because we don't like Eighth Circuit

4   case law, this is not an issue that has risen based on our

5   research fairly commonly, and the Eleventh Circuit case seems

6   directly on point as to the analysis here, which is at the

7   end of the day can objectively true speech, skim milk,

8   chicken meal, whatever it may be within the commercial

9   context, be redefined by a legislative body or by a private

10  trade group to the point where a person is subjected to

11  potential jail time based on saying that.  And we're asking

12  this Court to apply the *Central Hudson* analysis the way that

13  we walked through in our pleadings, the way that the

14  government has not even responded to in substance.  In that

15  sense they responded to the pleading but not to the argument,

16  and to base its decision based entirely on the allegations in

17  the indictment.  In other words, this doesn't require further

18  fact finding.

19          And one of the government's arguments that I just

20  wanted to briefly address is that essentially this requires

21  further fact finding.  And the government pointed the Court's

22  attention to a case, I believe it's pronounced *Caronia* in the

23  Second Circuit.  What's important about that Second Circuit

24  decision is that the District Court in that case and the

25  Second Circuit Court of Appeals in that case both analyzed

62

```
 1    the issues under the Central Hudson test and reached a

 2    conclusion, albeit different conclusions.  The district court

 3    reached one conclusion applying the same test, the Eleventh

 4    Circuit said basically we disagree applying the same test.

 5    But there's no dispute between the district court and the

 6    Second Circuit that the test was supposed to be applied.  And

 7    this didn't turn on somehow some sort of notion that a

 8    further factual record needed to be developed on trial.  This

 9    is a proper issue to be raised at the pretrial motion stage.

10          And what we've certainly asked the Court to do is

11    rule in our favor deciding that this is constitutionally

12    protected speech in the same way that the Eleventh Circuit

13    did with that dairy farmer.  But obviously if the Court were

14    to deny the motion at the pretrial stage, you know, I think

15    both parties agree that this issue can be raised at trial and

16    ultimately determined by a judge either with a deferred

17    ruling or ultimately a jury question.  But those facts that

18    the Court could theoretically defer ruling as a procedural

19    matter under the rules or that the jury could ultimately

20    decide one way or the other, not the ultimate legal First

21    Amendment question necessarily but that it was truthful

22    speech.  That doesn't negate the appropriateness of this

23    Court applying the Central Hudson analysis and reaching a

24    determination, which we believe has to flow in our favor, as

25    to the ultimate intermediate scrutiny test.
```

63

1    There's absolutely no reason at all that criminally

2    prosecuting somebody for not -- allegedly not using the

3    language the way that AAFCO, a private trade group, wants the

4    language to be used is the most narrowly tailored, you know,

5    restriction to serve a compelling government interest or an

6    important government interest.  And so we believe this fails

7    intermediate scrutiny.  Candidly I think it fails any level

8    of First Amendment scrutiny.

9    And all of this is premised on the notion of what

10   the government has actually alleged in the indictment.  It's

11   a pure First Amendment argument.  It's taking the allegations

12   at face value.  Simply saying something is wire fraud or mail

13   fraud or conspiracy to commit any of those things based on

14   the premise that there was a misrepresentation because

15   someone called chicken meal chicken meal doesn't pass First

16   Amendment scrutiny.  And that's ultimately what this comes

17   down to.  He shouldn't be subjected to a trial and further

18   limitations on his liberty as this case is pending.

19   THE COURT:  So you don't think it's material that

20   the government is alleging that these representations were

21   fraudulent, defrauded -- I guess the listener --

22   MR. GELFAND:  No.  In the same way -- in the same

23   way, Your Honor, and it's really -- if you take the Eleventh

24   Circuit case for example.  Let's assume instead of I think it

25   was a declaratory judgment action.  Let's assume instead that

64

1    the U.S. Attorney's Office in whatever district that would be

2    in in Florida prosecuted that farmer for selling milk where

3    the fat was skimmed but where Vitamin A wasn't added saying

4    the listener clearly thought Vitamin A was added, I mean,

5    come on, the legislature said that's what this means.

6              THE COURT:  And they paid more for it because they

7    thought --

8              MR. GELFAND:  And they paid more for it.

9              THE COURT:  -- because they thought it was skim milk

10   versus whatever, yeah.

11             MR. GELFAND:  Sure.  And they paid more for it.

12             THE COURT:  Uh-huh.

13             MR. GELFAND:  That would be an unconstitutional

14   prosecution based on the Eleventh Circuit's opinion in

15   *Ocheesee Creamery* because the speech itself and the First

16   Amendment protections don't turn on how it's understood by

17   the listener.  And that's true even with a legislature saying

18   that.  I mean, this is a private trade group.  At what point

19   does someone get to basically say, well, in our industry this

20   means this.  And then the U.S. Attorney's Office says -- and

21   the important distinction is they are not saying it's fraud

22   for any reason other than this.  They are saying it's fraud

23   because to use the *Ocheesee Creamery*, she called skim milk

24   skim milk.  That's where the First Amendment protects against

25   this kind of government overreach and government action.

65

```
 1                THE COURT:  All right.  Thank you.

 2                MR. GELFAND:  Thank you.

 3                THE COURT:  Mr. Birmingham.

 4                MR. BIRMINGHAM:  Briefly, Your Honor.  The First

 5      Amendment doesn't protect fraudulent speech.  The grand jury

 6      has returned an indictment.  The factual allegations in the

 7      indictment, which must be assumed true for purposes of

 8      deciding a motion to dismiss, are that the representations at

 9      issue to the various pet food manufacturers were false, they

10      were deceptive and misleading.  And the execution of a scheme

11      to profit from shipping adulterated food is unlawful conduct.

12                THE COURT:  The definition of adulterated, I mean,

13      the defendant's making this argument that it was all

14      chicken -- however you defined it, it was chicken meal or

15      chicken -- I know that there was like chicken by-product

16      versus chicken meal, and I guess -- how does -- I know the

17      word "adulterated" comes up in the statute.  How is it that

18      the grand jury determined that this was adulterated food?

19                MR. BIRMINGHAM:  The indictment sets forth with

20      great specificity the manners in which food was adulterated.

21      An example using Mr. Gelfand's example, calling something

22      turkey meal and using chicken by-product in that turkey meal.

23      So if I understood Mr. Gelfand, and maybe he's not that

24      versed in what actually happened down in Rosser, but turkey

25      meal was often created with turkey by-products, feather meal
```

1    and blend of chicken by-products, chicken bone meal and

2    chicken feathering.  So using his different animals analogy I

3    think he's already conceded his point.  If someone receives

4    something saying it was turkey meal and it contained chicken

5    meal or frogs or whatever it is, that's the type of

6    adulteration.

7            So from an economic adulteration standpoint, I'll

8    just tell you what's in the indictment and what the grand

9    jury found is there was some super cheap stuff such as feed

10   grade by-product meal or feed grade bone by-product chicken

11   meal that was purchased as raw material by Doug Haning.

12   Feather meal that was purchased as a raw material by Doug

13   Haning and A Grade by-product meal purchased by Doug Haning.

14   And that was regularly blended into a product that was

15   shipped off to suppliers, pet food manufacturers.

16           And there's not only industry definition of what

17   chicken meal is and turkey meal is, and Mr. Haning was well

18   versed in that because he was paying not chicken meal prices

19   or turkey meal prices for the feed grade bone by-product meal

20   but really cheap stuff, and that's how they achieved their

21   margins.

22           And these companies, pet food manufacturers, had

23   their own operational definition.  I'll give you one.

24   There's a specific company in Mishawaka that's been discussed

25   in prior pleadings.  And Mr. Haning was involved in

67

1  negotiation of a contract.  They said here's what the

2  definition of chicken meal is, it will contain no

3  by-products, it will contain no viscera or feet or heads and

4  it will be exclusive of feathers.  And what was regularly

5  shipped was a product that was -- that contained by-products

6  and had feathers.  And that's how they achieved their margins

7  and that's how he ended up getting his earn-out payment.  And

8  that's where Custom Ag comes in and he ends up getting money

9  from Custom Ag.

10         So the *Central Hudson* case goes out of its way to

11  distinguish what it was talking about, commercial speech that

12  is not false, not -- or deceptive and does not concern

13  unlawful activities.  That's when you look at the test in

14  civil cases like the *Creamery* case may come into play and

15  they may take a look at *Central Hudson*.  But that's not this

16  case.  This case does involve false representations.  It

17  involves deceptive representations and it certainly involves

18  unlawful activities, selling, shipping adulterated food

19  for -- and there's two different types of adulteration.

20  There's economic adulteration and then there's much more of a

21  safety type of component.  In other words, this is an unsafe

22  drug and it was adulterated.  This was purely an economic

23  adulteration case.  In other words, buying raw materials

24  using the same general understood definitional components,

25  feed grade versus pet food grade.  By-product meal versus

68

1    true or straight chicken meal feathers.  These are not

2    ambiguous terms open (INAUDBILE).

3           If various pet food manufacturers that received

4    bills of lading were misled to believe that they were

5    receiving products that didn't contain feathers and

6    Mr. Haning was regularly causing shipments that contained

7    feathers, well, that's misrepresentation, that's misleading,

8    that's fraud.  And he profited from it so that's why the

9    grand jury returned an indictment against him.

10          The First Amendment does not protect wire fraud,

11   mail fraud, money laundering proceeds and the food

12   adulteration that's set forth as deceptive for a felony under

13   Title 21 U.S.C. 331.  It doesn't protect it and it shouldn't.

14          THE COURT:  Anything more, Mr. Gelfand?

15          MR. GELFAND:  Two brief responses, Your Honor.

16          THE COURT:  Uh-huh.

17          MR. GELFAND:  I don't agree with the

18   characterization that Mr. Birmingham made about what's

19   alleged in the indictment, but the Court is in just as good

20   if not a better place of reviewing that than we are so I

21   would just ask the Court to look at what is actually alleged

22   in the indictment.

23          Second of all, Mr. Birmingham's analysis now

24   ultimately boils down to, and I guess consistent with the

25   pleading, that a *Central Hudson* test shouldn't even be

69

1  applied in the first place because the Court should assume at

2  the outset based on the indictment allegations alone that

3  there was fraud, that there were false representations.  And

4  this ultimately just boils down to a disagreement between the

5  parties on what's alleged on what the law requires.  We set

6  it out very thoroughly in our pleadings.

7         I think it would be error for the Court not to apply

8  a *Central Hudson* analysis.  And I would just leave the Court

9  where I started, which is even now after Mr. Birmingham has

10 addressed this issue, they are doubling down, "they" being

11 the government are doubling down on the notion that *Central*

12 *Hudson* doesn't apply and inherently conceding that they lose

13 under *Central Hudson* because the burden shifts to the

14 government.  And they have done absolutely nothing by way of

15 evidence or argument to meet that burden.  And so to the

16 extent that the Court correctly concludes in our view that

17 *Central Hudson* applies, then the government has not met their

18 burden.  They haven't even attempted to, they've just said

19 don't apply that test.  And we believe that it does apply and

20 we've said it in abundance of legal authority where courts

21 have correctly applied that analysis to First Amendment

22 challenges.

23        THE COURT:  Thank you.

24        MR. GELFAND:  Thank you, Your Honor.

25        THE COURT:  All right.  That concludes argument on

 1   all of these issues.  And I am going to order a transcript of

 2   these -- of the recorded proceedings.  And then after

 3   receiving that I will issue several rulings in this matter.

 4   Thank you very much for your argument.

 5          You guys have not ever agreed on anything.  Will you

 6   agree that we want the Blues to win tonight or are you like

 7   some sort of closet Bruins fan?

 8          MR. BIRMINGHAM:  I'm rooting for the Blues.  I was

 9   waiting to see if Mr. Gelfand tipped his hand first.

10          THE COURT:  Bruins or Blues?

11          MR. GELFAND:  I am rooting for the Blues but my wife

12   is from Boston, so --

13          THE COURT:  See, I knew somebody was going to be a

14   problem.

15          MR. GELFAND:  If we can seal that part of the

16   transcript, I would appreciate that.

17          THE COURT:  Okay.  Well, at least we're in the

18   Stanley Cup, so we'll see what happens.  Thank you very much.

19          MR. GELFAND:  Thank you.

20          (Court in recess at 2:24 p.m.)

21

22

23

24

25

1                  C E R T I F I C A T E

2              I, Susan R. Moran, Registered Merit Reporter, in

3    and for the United States District Court for the Eastern

4    District of Missouri, do hereby certify that I was not

5    present at the proceedings in the above-mentioned court; and

6    that the foregoing transcript is a true, correct, and

7    complete transcript of the electronic recording.

8              I further certify that I am not attorney for, nor

9    employed by, nor related to any of the parties or attorneys

10   in this action, nor financially interested in the action.

11             I further certify that this transcript contains

12   pages 1 - 71 and that this reporter takes no responsibility

13   for missing or damaged pages of this transcript when same

14   transcript is copied by any party other than this reporter.

15             IN WITNESS WHEREOF, I have hereunto set my hand

16   at St. Louis, Missouri, this 26th day of June, 2019.

17

18                          _____
                            /s/ Susan R. Moran
19                          Registered Merit Reporter

20

21

22

23

24

25